724 F.Supp. 1538 (1989)
Joseph P. CONNORS, Sr., Donald E. Pierce, Jr., William Miller, William B. Jordan and Paul R. Dean, as Trustees of the United Mine Workers of America 1950 Pension Trust, 1950 Benefit Plan and Trust, 1974 Pension Trust and the 1974 Benefit Plan and Trust, Plaintiffs,
v.
Nestor PELES, Nicholas Rend, Stephen Peles and Linda Peles Kohut, Defendants.
Civ. A. No. 86-1107.
United States District Court, W.D. Pennsylvania.
November 2, 1989.
*1539 *1540 *1541 Jack W. Plowman, Plowman and Spiegel, Pittsburgh, Pa., for plaintiffs.
Robert W. Lambert, Indiana, Pa., for defendants.

FINDINGS OF FACT, CONCLUSIONS OF LAW, OPINION AND ORDER
SIMMONS, District Judge.

FINDINGS OF FACT
1. Plaintiffs, Joseph P. Connors, Sr., Donald E. Pierce, Jr., William Miller, William B. Jordan and Paul R. Dean, are the Trustees of the United Mine Workers of America 1950 and 1974 Pension Plans.
2. The Pension Plan is domiciled in the District of Columbia.
*1542 3. Pelbro Fuel, Inc., is a Pennsylvania business corporation, with offices at R.D. # 1, Glen Campbell, Pennsylvania, duly incorporated under the laws of the Commonwealth of Pennsylvania pursuant to a charter issued by the Department of State thereof on September 17, 1973.
4. Pelbro was incorporated by Defendant Nestor Peles, and his brother, Joseph Peles, to provide continuity of life to a business enterprise, for tax purposes and as a shield against personal liability.
5. Defendants, Nestor Peles, Nicholas Rend, Stephen Peles and Linda Kohut are, at all time material hereto, were shareholders of Pelbro. Each of the Defendants was a resident of the Commonwealth of Pennsylvania at all times material to this litigation.
6. On March 27, 1981, all of the outstanding and issued shares of Pelbro stock were held by Robert Westrick, and by Defendants Nestor Peles, Nicholas Rend, Stephen Peles and Linda Peles Kohut.
7. From September 19, 1973, through the time of trial, Defendant Nestor Peles was the president and chief executive officer of Pelbro, and a director of Pelbro.
8. At all times material to this litigation, Defendant Nicholas Rend was a vice president of Pelbro. Nicholas Rend served as a director of Pelbro from 1981 through the date of trial.
9. From October 22, 1981 to July 1, 1984, Defendant Stephen Peles was a Vice President of Pelbro.
10. From March 5, 1974 through September 17, 1974, Defendant Linda Peles Kohut served as secretary of Pelbro.
11. From September 17, 1974, through October 21, 1981, Robert Westrick served as Secretary of Pelbro.
12. Between October 26, 1976, and March 27, 1981, Pelbro and the United Mine Workers of America, were signatory to the 1974 Bituminous Coal Wage Agreement and the 1978 Bituminous Coal Wage Agreement.
13. The National Bituminous Coal Wage Agreement of 1978 expired on March 27, 1981.
14. Pursuant to Article XX(d)(1) of the National Bituminous Coal Wage Agreement of 1978, Pelbro was required to make contributions on behalf of its work force to the Pension Fund.
15. Following the expiration of the 1978 National Bituminous Coal Wage Agreement on March 27, 1981, Pelbro has not been required to make contributions to the Pension Fund, and thereby incurred a "withdrawal" within the meaning of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. ง 1001, et seq., as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA").
16. At all times material hereto, Pelbro was engaged in the mining of bituminous coal in Western Pennsylvania.
17. Between October 26, 1976 and March 27, 1981, Pelbro employed four to ten union employees under the Bituminous Coal Wage Agreements.
18. In 1974, Pelbro acquired extensive mining rights to two separate undeveloped surface mining operations known as the "Penn Run" and "Brush Valley" jobs, covering in excess of 1,000 surface acres.
19. Pelbro engaged in the mining of its "Penn Run" job from 1974 through 1976, and operated the "Brush Valley" job from 1976 through 1985. Pelbro ceased active mining operations in 1985, but has attended to backfilling and reclamation to some degree since that time.
20. The "Penn Run" leases acquired by Pelbro had a value, at the time of acquisition, of $100,000 to $125,000.
21. From 1974, and throughout the course of its coal mining operations, Pelbro held a valid surface mining operators license, mine drainage permits and mining permits on its strip mining operations, issued by the Department of Environmental Resources of the Commonwealth of Pennsylvania.
22. From 1976 to 1978, Pelbro's coal production was sold to Greenwich Collieries, a division of Pennsylvania Mines Corporation. Pennsyvlania Mines Corporation *1543 was a subsidiary of Pennsylvania Power and Light Corporation.
23. From January 1, 1979, and thereafter, Pelbro sold its coal production to Yellow Creek Coal Sales.
24. Yellow Creek Coal Sales was a sole proprietorship owned by Stephen Peles.
25. Yellow Creek Coal Sales did not hold a surface mining operators license, mine drainage permits or mining permits and was not authorized by the Commonwealth of Pennsylvania to engage in coal mining operations, and never engaged in coal production. Yellow Creek Coal Sales was solely engaged in the purchase, marketing and sale of coal.
26. Yellow Creek Coal Sales was formed by Stephen Peles, upon the advice of his father, Nestor Peles, after consultation between Pelbro officials and officials of the Pennsyvlania Power and Light network, for the specific purpose of creating a separate business entity to provide a market for Pelbro's coal, and to acquire coal from other sources independent of Pelbro, of different quality and specification than the Pelbro coal, to meet certain standards of the PP & L coal order, resulting from an existing deterioration in the sulphur quality of the Pelbro coal production, which threatened Pelbro's purchase order with the PP & L network.
27. Pelbro was advised by Pennsyvlania Power and Light officials, that if the purchase orders were taken from Pelbro and granted to Yellow Creek Coal Sales, that the purchase orders should thereafter permanently remain with Yellow Creek Coal Sales.
28. On December 26, 1978, Pelbro sent written notice to the United Mine Workers of America, advising them that Pelbro's coal production would be sold to Yellow Creek Coal Sales, effective January 1, 1979.
29. PR & W was a partnership comprised of Nestor Peles, Nicholas Rend, Linda Peles Kohut and Robert Westrick, formed for the purpose of providing management and consulting services to Pelbro.
30. PR & W from time to time provided management and consulting services to Pelbro. Following the creation of Yellow Creek Coal Sales in 1979, PR & W provided management and consulting services to Yellow Creek Coal Sales.
31. PR & W was terminated in 1982 following Robert Westrick's sale of his stock in Pelbro.
32. A successor partnership to PR & W was formed by Nestor Peles, Nicholas Rend, Stephen Peles and Linda Peles Kohut, under the name of Ren-Koe.
33. Pelbro paid management and consulting fees of $65,000 to PR & W, comprised of a payment of $45,000 on November 25, 1979, $10,000 on April 9, 1980 and $10,000 on June 10, 1980. Management and consulting fees were paid by Pelbro to Ren-Koe of $3,000 on September 10, 1985.
34. Yellow Creek Coal Sales paid management and consulting fees to PR & W of $158,798 during calendar year 1979, $146,898 during calendar year 1980 and $223,006 during calendar year 1981.
35. Fair and reasonable compensation paid to managers and supervisors of coal mining operations in Western Pennsylvania during the years material to this litigation was $50,000 to $75,000 per year.
36. On March 27, 1981, the United Mine Workers of America commenced a prolonged strike, resulting in a cessation of Pelbro's mining operations for approximately two and one-half months.
37. Pelbro did not engage in coal mining operations during the term of the strike.
38. Following the conclusion of the strike, all but two of Pelbro's employees returned to work with Pelbro, however, they did not return as union employees, and at no time thereafter was Pelbro a party to any further collective bargaining agreement with the United Mine Workers of America, nor obligated to make further contributions to the Pension Plan, resulting in Pelbro's withdrawal under ERISA from the Pension Fund.
*1544 39. In 1982, Pelbro was ordered by the Department of Environmental Resources of the Commonwealth of Pennsylvania to engage in substantial backfilling operations, requiring Pelbro to remove heavy equipment from its coal production operations and to devote the equipment and attendant manpower to backfilling and reclamation, at a considerable expense and resulting in a substantial decrease in coal production.
40. During 1982, Pelbro encountered an unexpected geologic fault, from a vein of coal previously mined by Pelbro of approximately 38 inches, dipping and rolling down to meager veins of, at times, 6 inches, in the coal seams at its Brush Valley job, resulting in a total, catastrophic loss of its coal reserves.
41. From time to time, Pelbro borrowed funds from banks, from its shareholders, from PR & W and from Yellow Creek Coal Sales.
42. On March 27, 1981, the sum of the non-bank loans outstanding to Pelbro was $255,000, comprised of a loan from Nestor Peles of $90,000, Yellow Creek Coal Sales $35,000 and PR & W $130,000.
43. By August 31, 1983, the aggregate of the non-bank loans to Pelbro had risen to $569,853, an increase of $314,853 over the loan balances at August 31, 1981. The August 31, 1983 loan balance was comprised of loans due PR & W of $73,053, Yellow Creek Coal Sales of $154,400, Nestor Peles of $132,101, Nicholas Rend of $73,500, Stephen Peles of $73,500, Linda Kohut Peles of $23,299 and Ren-Koe of $40,000. These additional loans were made to Pelbro to enable Pelbro to comply with the backfilling order of the Department of Environmental Resources of the Commonwealth of Pennsylvania.
44. Although the monies loaned to Pelbro by its shareholders, PR & W and Yellow Creek Coal Sales were not contemporaneously evidenced by Notes or other written obligations of Pelbro, all of the loans were evidenced as such by written notations on the bank deposit records. Although interest was not paid on the loans, the loans were nevertheless recognized as loans at the time by both Pelbro and the lenders and were bona fide loans.
45. Pelbro paid dividends to its shareholders during each of its eight fiscal years commencing with its initial fiscal year ending August 31, 1974.
46. Pelbro had the following retained earnings:

 FYE AMOUNT
 8/31/74 $ 92,228.62
 8/31/75 205,496.48
 8/31/76 34,248.01
 8/31/77 6,933.01
 8/31/78 53,109.23
 8/31/79 4,616.29
 8/31/80 145,457.92
 8/31/81 220,311.18

47. On September 17, 1983, Pelbro transferred a piece of heavy mining equipment, a dragline, to its shareholders and to PR & W, in consideration of certain loans previously made by these parties to Pelbro, totalling $373,383.73. The dragline then had a fair market value of $350,000 to $400,000. The transfer of the dragline resulted in a cancellation of the indebtedness of Pelbro to these parties for the loans previously made. The transaction was evidenced by a corporate resolution and by a bill of sale.
48. In 1983, Pelbro transferred 7 motor vehicles, having an approximate fair market value of $30,000, to Defendants. The motor vehicles were transferred by Pelbro to the shareholders as partial payment for the loan indebtedness of Pelbro to the shareholders.
49. During the years 1983 and 1984, Pelbro disposed of substantial other equipment, through bona fide sales and bank repossessions. Additional other equipment noted on Pelbro's depreciation schedules, not presently owned by Pelbro, reflect junked property, property earlier traded-in on other equipment and items of "capital repairs", capitalized on its depreciation schedules and disposed of at the time that the subject equipment was removed. Neither the shareholders, PR & W or Yellow Creek Coal Sales received any financial benefit as a result of these transactions.
*1545 50. Pelbro was, at all times through March 27, 1981, adequately capitalized for the undertaking in which it engaged.
51. Each of the corporate officers and directors played a viable function in the performance of their duties on behalf of the corporation. Each of the officers and directors was personally involved in the business of the corporation. Each of the officers and directors devoted time, energy and attention to the affairs of the corporation.
52. At all times material to this litigation, Pelbro observed basic corporate formalities, although in an informal manner. Pelbro gave the appearance to all concerned that it was a corporation. Pelbro issued stock certificates to its shareholders, maintained a corporate minute book and stock register and utilized a corporate seal. Corporate meetings were conducted from time to time. Officers and directors were elected. Pelbro maintained offices, had business stationery and a business telephone. The assets utilized by Pelbro were titled in Pelbro's name. Pelbro used the suffix "Inc." at the time of the execution of the National Bituminous Coal Wage Agreement of 1974 and the National Bituminous Coal Wage Agreement of 1978, on its tax returns and on most other documents compiled by Pelbro.
53. Pelbro was an entity distinct from its shareholders, distinct from Yellow Creek Coal Sales and distinct from PR & W and Ren-Koe. Pelbro was engaged in the mining and extraction of coal, was the employer of four to ten employees and an operating company.
54. Pelbro maintained substantial records and complied with the general record keeping standards required of a business corporation. Corporate minutes and resolutions were prepared with some degree of regularity. A corporate minute book was maintained. By-laws were adopted by the corporation. Stock certificates were issued by the corporation to its shareholders. A stock transfer ledger was acquired by Pelbro, kept up-to-date and maintained along with corporate records. The corporation maintained ledgers and books of account, and financial statements were routinely prepared. Federal and state tax returns were routinely filed. Pelbro's records were kept separate and apart from the records of its shareholders and from the records of Yellow Creek Coal Sales and PR & W/Ren-Koe. Pelbro routinely compiled and submitted employers quarterly federal tax returns, unemployment compensation reports, workers compensation reports, federal coal excise tax returns and surface and reclamation returns. All loans made to Pelbro by the shareholders were recorded as loans on the deposit records of Pelbro.
55. Pelbro was not insolvent at any time through March 27, 1981
56. Pelbro maintained separate bank accounts, and maintained its funds separate and apart from any funds of its shareholders, Yellow Creek Coal Sales, PR & W or Ren-Koe. At no time did Pelbro comingle its funds with the funds of any other person.
57. Pelbro was incorporated by the incorporators for legitimate purposes, and not as a fraud or subterfuge or facade for the operations of any other person.
58. Pelbro never operated as a facade for the operations of any other person.
59. Pelbro's insolvency arose as a result of economic conditions resulting from a backfilling order imposed by the Department of Environmental Resources of the Commonwealth of Pennsylvania, and the attendant costs to comply with the backfilling order and the loss of coal production resulting from coal mining equipment being utilized for backfilling purposes, and as a result of the loss of its coal reserves from the subsurface geologic conditions encountered at the Brush Valley job.
60. Plaintiffs never sent written notice to the Defendants, as individuals, advising Defendants that they were personally liable for the payment of the withdrawal liability of Pelbro.
61. Defendants are not employers, as that term is defined under ERISA, and Defendants are not the alter ego of Pelbro.

*1546 CONCLUSIONS OF LAW
1. This Court has subject matter jurisdiction as conferred by ERISA, 29 U.S.C. ง 1451(c). Further, the Court has personal jurisdiction over Defendants and venue is proper in this Court pursuant to ERISA 29 U.S.C. ง 1451(d).
2. Pelbro Fuel, Inc., a Pennsyvlania business corporation incurred a "withdrawal" from the pension plans administered by Plaintiff, as defined under ERISA, on March 27, 1981, resulting in an obligation of "withdrawal liability" to Plaintiffs.
3. The claim asserted by Plaintiffs before the Court at trial is founded exclusively upon the "alter ego" theory of "piercing the corporate veil" and Defendants were never lawfully notified as to Plaintiff's claim against them.
4. Defendants were not the "alter ego" of Pelbro on March 27, 1981, before or at any time thereafter material to this litigation. The facts found in this case do not justify a piercing of the corporate veil.
5. Plaintiffs have not pleaded, nor are they entitled to recover upon any theory of preferential transfers, defacto liquidations, fraudulent conveyances or the like under the "Avoidance" statutes of ERISA, 29 U.S.C. ง 1392(c).
6. Plaintiffs have not pleaded, nor are entitled to recover under the "controlled group" statutes, 29 U.S.C. ง 1301(b)(1).
7. Defendants are entitled to reasonable attorneys fees and costs, 29 U.S.C. ง 1132(g)(1), to be determined by the Court upon application to be by Defendants within ten (10) days after the date of entry of judgment by the Court, and after consideration of any answer thereto, to be filed by plaintiffs within ten (10) days after service of Defendants' application for attorneys fees and costs.

OPINION

DISCUSSION OF FACTS
This action is before this Court pursuant to a complaint filed by the Plaintiffs, Trustees of the United Mine Workers of America (hereinafter "UMWA") 1950 and 1974 Pension Plans (hereinafter "Plans") against the Defendants seeking "withdrawal liability" as provided under the Employee Retirement Income Security Act of 1974 (ERISA) 29 U.S.C. ง 1001, et seq., as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA").
Plaintiffs' original complaint set forth three separate counts wherein Plaintiffs alleged that the Defendants were responsible for the "Withdrawal Liability" under the provision of 1950 and 1974 UMWA Pension Plans. Counts I and II of Plaintiffs' original Complaint were dismissed by Order of this Court on April 8, 1987, because the Defendants were not "employers" as defined under ERISA or the Labor Management Relations Act and because the pendant state law claim asserting that Defendants were employers under a Pennsylvania Statute is pre-empted by ERISA and the "MPPAA".
Plaintiff filed an amended complaint[1] alleging that Pelbro Fuel, Inc., a signatory to the National Bituminous Coal Wage Agreements of 1974 and 1978 and the individual defendants had incurred "Withdrawal Liability" as imposed by ERISA; that Pelbro Fuel, Inc., and the Defendants were notified of the assessment of "Withdrawal Liability" that Pelbro Fuel, Inc., and the individual Defendants had failed to discharge their "Withdrawal Liability" obligations; that the individual Defendants had significant ownership interest and control over the operation of Pelbro Fuel, Inc.; that the individual Defendants were personally involved in matters pertaining to the 1950 and the 1974 U.M.W.A Pension Trusts and the decision of Pelbro Fuel, Inc. to withdraw therefrom; that the individual Defendants acted in the interest of Pelbro Fuel, Inc. in relation to the Pension Trusts; that Pelbro Fuel, Inc. was undercapitalized; that corporate formalities had not been observed in the operation of Pelbro Fuel, Inc.; that Pelbro Fuel, Inc. had failed to pay dividends; that the individual Defendants *1547 had siphoned the funds of Pelbro Fuel, Inc.; that Pelbro Fuel, Inc. was a facade for the operations of the individual Defendants; that the individual Defendants operated Pelbro Fuel, Inc. with personal funds and loaned large sums of money to Pelbro Fuel, Inc.; that the individual Defendants repaid their loans to Pelbro Fuel, Inc. from Pelbro Fuel, Inc. funds while Pelbro Fuel, Inc. was failing; that consequently the individual Defendants and Pelbro Fuel, Inc. were alter egos and that the individual Defendants are jointly and severally liable to the plaintiffs for the withdrawal liability.
Defendants have denied all of the plaintiffs relevant allegations and contend that they have no financial obligation of any kind to the plaintiffs, and in any event they were not lawfully notified of plaintiffs' claim.
A non-jury trial of some length was held and this Court has hereinabove determined the findings of fact from the evidence presented in said case, and has formulated appropriate conclusions of law as hereinabove stated, and this Opinion, which now follows, is a discussion of the same.
Pelbro is a Pennsylvania corporation engaged in coal mining, that was signatory to the 1974 and 1978 Bituminous Coal Wage Agreements with the UMWA between October 26, 1976, and the expiration of the 1978 Bituminous Coal Wage Agreement on March 27, 1981 (Paragraphs 8 and 11, Amended Complaint and Answer, Defendants' Exh. 34 and 36).
Defendants, Nestor Peles, Nicholas Rend, Stephen Peles and Linda Kohut are all residents of the Commonwealth of Pennsylvania. Nestor Peles served as Chairman of the Board, President and Director of Pelbro Fuel, Inc. ("Pelbro"), a Pennsylvania corporation (Stipulation of Parties N.T. 6-7). Nicholas Rend served as Secretary/Treasurer of Pelbro Fuel, Inc. (N.T. 10-22), and has served as Director of Pelbro since October 22, 1981 (Plaintiffs' Exh. 11 p. 18). Stephen Peles served as a vice-president of Pelbro from October 22, 1981 (Plaintiffs' Exh. 11, p. 18) through July 1, 1984 (Plaintiffs' Exh. 11, p. 29). Nestor Peles, Nicholas Rend, Stephen Peles and Linda Kohut are all shareholders of Pelbro (N.T. 6-11).
Between October 26, 1976 and March 27, 1981, Pelbro employed between four to ten employees (N.T. 367-368, 1020), remitting dues through check-offs to the UMWA regularly on their behalf (N.T. 1136-1138) (Defendants' Exh. 39).
Pelbro was incorporated on September 19, 1973, under the laws of the Commonwealth of Pennsylvania, by the filing of Articles of Incorporation with the Corporation Bureau of the Department of State (Plaintiffs' Exh. 1). The initial incorporators were Nestor Peles, one of the Defendants herein, and his brother, Joseph Peles (N.T. 32-33). Nestor Peles and Joseph Peles had been involved in coal mining operations for many years prior to the formation of Pelbro. Pelbro did not commence operations immediately following incorporation and did not engage in business until 1974 (N.T. 40-41). Joseph Peles, in the interim, transferred his stock in Pelbro to Nestor Peles, prior to the commencement of coal mining operations (N.T. 42). The purpose of incorporation was to provide continuity of life to the business entity (N.T. 84), for tax reasons and as a shield against personal liability (N.T. 984-981). Following the acquisition by Nestor Peles of the stock of his brother, Joseph Peles, certain stock issues in Pelbro were acquired by the other Defendants, all children or spouses of the children of Nestor Peles, through stock gifts from Nestor Peles or through subsequent original issues by the corporation (N.T. 1296).[2]
*1548 The paid-in capital reflected on Pelbro's books for its original stock issue was $2,000.00 (N.T. 1297). The paid-in capital reflected on the books of the corporation has never exceeded $3,846.00 (N.T. 502). Pelbro was a cash basis taxpayer and maintained its books and records on a cash basis (N.T. 549, 584). Shortly after its incorporation, however, Pelbro acquired a series of coal leases from its incorporation, Nestor Peles and Joseph Peles, through an assignment dated March 15, 1974, (Defendants' Exh. 4, N.T. 992-993), at about the time that Joseph Peles transferred his shares to Nestor Peles, and prior to commencing business operations. The coal leases (Defendants' Exh. 5-11 and 12-15) covered extensive mining rights to two separate undeveloped surface mining operations known as the "Penn Run" and "Brush Valley" jobs (N.T. 998-1015) covering in excess of 1,000 surface acres (N.T. 1019, 1143-1146). The value of the "Penn Run" leases alone was estimated by Nestor Peles to be between $100,000 and $125,000 (N.T. 1016-1018) and estimated by Pelbro's accountant to be $125,000 at the time the leases were contributed to the corporation (N.T. 508-509). For bookkeeping purposes, the leases were never recorded as an asset on any of the corporations' financial statements, as Pelbro was a cash basis taxpayer and nothing was ever paid by Pelbro for the leases (N.T. 507, 508). Pelbro had issued "no par" stock. When the "Penn Run" and "Brush Valley" leases were contributed to the capital of Pelbro, the true value of the Pelbro stock would have increased proportionately (N.T. 504-505).
Pelbro engaged in the mining of its "Penn Run" job from 1974 through 1976 (N.T. 1027-1028). During this time, Pelbro's gross revenues from the Penn Run job, through exploitation of the "Penn Run" leases (Defendants' Exh. 5-11) were approximately $2,796,771.[3] At the "Penn Run" job, Pelbro mined the "B" seams of coal, a vein with a uniform thickness of 36 to 38 inches (N.T. 1006-1007).
After extraction of the mineable coal from the Penn Run job, Pelbro commenced operations at its Brush Valley job site in the fall of 1976, although Pelbro continued backfilling and reclamation operations at its Penn Run job (N.T. 1027-1028).
At the time that the Brush Valley leases (Defendants' Exh. 12-15) were contributed to the capitalization of Pelbro, their value was unknown because of a lack of specific data (N.T. 1016-1018). This aspect of Pelbro's capitalization, however, resulted in substantial income to Pelbro over the years, as reflected in Pelbro's tax returns (Plaintiff Exh. 29, 33-37).[4]
From 1976 to 1978, Pelbro's coal production was sold to Greenwich Collieries, a division of Pennsylvania Mines Corporation. Pennsylvania Mines Corporation was a subsidiary of Pennsyvlania Power and Light Corporation, (Court Exh. 1).
At all times material to this litigation, Pelbro held a valid Surface Mining Operators License issued by the Department of Environmental Resources of the Commowealth of Pennsylvania (N.T. 1150-1153, Defendants' Exh. 42). At all times Pelbro held valid Mine Drainage Permits and Mining Permits on its strip mine operations (N.T. 1143-1149, Defendants' Exh. 41). The combination of the mining "license" and mining "permits" entitled Pelbro to engage in strip mining operations under the laws of the Commonwealth of Pennsylvania.
Pelbro's initial mining operations, commenced at the Penn Run job in 1974, involved *1549 a single bulldozer and a single frontend loader (N.T. 1019). At the height of Pelbro's operations, the corporation owned and operated a large dragline (N.T. 1154) and substantial other heavy mining equipment (N.T. 1019-1020, 1027-028). At all times Pelbro owned its mining equipment. None of the mining equipment utilized by Pelbro in its operations was ever owned by any of the shareholders (N.T. 266, 366-367).
The principals assumed different roles and functions on behalf of Pelbro. Nestor Peles, its President, served as the general supervisor of all field and business matters and, essentially, was the chief executive officer and figurehead of the corporation (N.T. 372). Nicholas Rend, directly supervised the coal extraction and loading operations (N.T. 373) and was in charge of mine safety (N.T. 1024-1026). Stephen Peles was responsible for supervision of machinery and mechanical repairs (N.T. 373, 1029). Robert Westrick was primarily responsible for bookkeeping and similar functions (N.T. 1024-1026). There was by necessity, given the closely-held nature of the business, substantial overlapping of responsibilities and functions (N.T. 1024-1026).
In 1978, Pelbro encountered serious concerns with the quality of the coal at its "Brush Valley" job, essentially a "deteriorating" high sulfur grade encountered in the seam and being mined (N.T. 1040-1041). The problem threatened Pelbro's purchase order with the Pennsylvania Power and Light network and led to serious talks with PP & L officials (N.T. 1041, 1043-1044). At this point, Pelbro was producing significant quantities of coal and, as described by Nestor Peles, things were "going too fast" (N.T. 1155-1159).
In an attempt to solve the serious problems encountered by Pelbro with the high sulfur content of its coal, Nestor Peles suggested the formation of a separate company as a "Marketing agent" and source for the purchase of Pelbro's coal. The idea, reviewed with and approved by management of the PP & L network, gave rise to the formation of "Yellow Creek Coal Sales",[5] an independent company. The independence of Yellow Creek from Pelbro enabled Yellow Creek to more readily purchase coal from other coal producers who were reluctant to sell coal to other coal operators with whom they competed on a day-to-day basis (N.T. 1304, 1312-1314).
Following substantial discussions with PP & L officials, a determination was made by the PP & L network to terminate the Pelbro coal orders, and to commence an ongoing purchase arrangement with Yellow Creek (N.T. 1046)
At the time the purchase order was given up by Pelbro and acquired by Yellow Creek, the PP & L officials made it plain that they viewed a long-term relationship with their customers as paramount, and that, if the order were obtained by Yellow Creek, that the arrangement should be permanent (N.T. 1063). Accordingly, Pelbro sent written notice to the UMWA on December 26, 1978 (Defendants' Exh. 43, Plaintiffs' Exh. 59) that its coal production would thereafter be sold to Yellow Creek. The Pension Fund also received a copy of the letter (Plaintiffs' Exh. 59, p. 88).
Yellow Creek was engaged strictly in the business of the purchase and sale of coal. Yellow Creek never held a surface mining license or surface mining permits (N.T. 1149-1150). Yellow Creek utilized its own business stationery (Defendants' Exh. 33) and its financial transactions were the subject of separate tax reporting by Stephen Peles (Plaintiffs' Exh. 44-49). Although Yellow Creek did not require a separate office, its files were kept separate and apart from the Pelbro records (N.T. 1073-1074). Trucking and transportation expenses for delivery of the coal purchased by Yellow Creek to the Greenwich Collieries facilities were paid by Yellow Creek (N.T. 295-296).
*1550 Yellow Creek realized a profit of anywhere from $2.00 to $6.00 per ton (N.T. 292-293) on coal purchased from Pelbro and from independent sources.
Following the creation of Yellow Creek, Pelbro sold its coal production on an on-going basis directly to Yellow Creek. During 1979, Yellow Creek purchased all of Pelbro's coal production and purchased approximately 352,000 ton of low sulfur grade coal from independent sources (N.T. 779-782, 1171). Under an arrangement worked out between Yellow Creek and Greenwich Collieries (through the PP & L network), Yellow Creek shipped all of the coal acquired from Pelbro directly to Greenwich Collieries, and shipped all of the low grade sulfur coal acquired from independent sources directly to Greenwich Collieries. Under the purchase order betweeen Greenwich Collieries and Yellow Creek, all of the coal sold by Yellow Creek during any calendar month would be "blended" to the account of Yellow Creek, with the low grade sulfur coal balancing the high grade sulfur coal purchased by Yellow Creek from Pelbro (N.T. 1039-1040, 1047).
Yellow Creek Coal Sales engaged in substantial contacts with coal brokers, coal operators and producers, sampled coal, analyzed coal, and engaged in substantial and ongoing price negotiations with PP & L officials from Allentown, Pennsylvania, involving a number of meetings at mine sites and at the Greenwich Colliery facilities (N.T. 463, 1312-1314).
Yellow Creek recorded a net profit of $7,409.12 during calendar year 1979, $5057.23, during calendar year 1980, $8570.51, during calendar year 1981, a net loss of $3,325.00 during calendar year 1982, a net profit of $11,966.00 during calendar year 1983 and $26,627.00 during calendar year 1984.
Pelbro's operations were immensely successful from the onset (Plaintiffs' Exh. 30, 42), and its success continued into 1982 (Plaintiffs' Exh. 29, 31-37, 42). During this period, Pelbro realized substantial income from its coal mining operations.
Dividends were paid by Pelbro during its first fiscal year ending 8/31/74, and during each of its succeeding seven (7) fiscal years through fiscal year ending 8/31/81 (Plaintiffs' Exh. 42, Plaintiffs' Exh. 29-36). Pelbro had net taxable income (usually substantial) from its first fiscal year through its seventh fiscal year (ending 8/31/80) and was able to minimize the loss ($90,792.75) sustained during its eighth fiscal year ending 8/31/81, despite a two and one-half month UMWA strike (Plaintiffs' Exh. 42).[6]
Pelbro later acquired additional coal deposits adjoining its "Brush Valley" job and opened its "Little C" seam, containing a lower sulfur coal than the "B" seam previously mined (N.T. 1171-1172). Pelbro continued to sell its coal production to Yellow Creek thereafter (N.T. 1063, 1312-1314). Pelbro's management viewed the ability of Yellow Creek, on short order, to obtain coal from outside sources in the event of further sulfur or quality control problems with the coal, as essential (N.T. 1312-1314). PP & L would further have looked with disfavor upon any change in the relationship between Yellow Creek and PP & L (N.T. 1063, 1155-1159). Perhaps noteworthy, things worked well under the new arrangement (N.T. 1312).
As the pension fund audit supervisor and trial witness, Vincent A. Rzasa (N.T. 884) indicated, it is not unusual, and a common practice, to find a group of business entities in the coal industry under common control, set up to perform different functions (N.T. 926). For example, the coal produced by or purchased by Oneida Mining Company, Greenwich Collieries, Tunnelton Mining Company and Rushton Mining Company, each separate business entities, is sold to Pennsylvania Mines Corporation (N.T. 913-914, Court Exh. 1). All of these companies are part of the PP & L network. PP & L officials such as Joseph Terrible (N.T. 1036-1038) provide management advice and services from time to time to these *1551 subsidiary networks of companies (N.T. 1037-1038).
Pelbro was at all times a small, closely held family business corporation. As such, its affairs were generally handled in an informal manner, unlike that of perhaps, PP & L or Ford Motor Company. At all times, however, Pelbro did observe basic corporate requirements. Meetings were frequently held by the Principals, most of which were on the job (N.T. 77-78), but many of which were conducted in the Pelbro office (N.T. 79, 1031-1032), and in the offices of its attorney (N.T. 79, 1336-1339). Pelbro maintained a registered office in accordance with the Business Corporation Law of the Commonwealth of Pennsylvania (N.T. 1069). A formal office setting or "board room" was not critical to Pelbro's operations or business (N.T. 1070-1072). Pelbro owned and maintained a corporate minute book (N.T. 337-338), (Plaintiff's Exh. 14). The meetings were informal. Minute book entries were not made in every instance (N.T. 106, 1031), although attempts were made to record the most critical concerns in the minutes (N.T. 1031-1032). The meetings, whether on the job, in the company offices or at the attorney's office, appear to have been attended by all of the principals with reasonable regularity. Although Robert Westrick, the former husband of Defendant, Linda Kohut, recalled attending but one meeting during his tenure with the corporation (N.T. 416), the secretary (Cynthia Davis) to the lawyer that represented Pelbro, recalled Westrick's attendance at corporate meetings held at the attorney's office at least on three to four specific occasions (N.T. 1137). That he attended a number of corporate meetings elsewhere is beyond doubt (N.T. 416, 419, 446).
Pelbro maintained an office at the job sites (N.T. 78), although it also maintained an office at the residence of Nestor Peles (N.T. 79). Pelbro maintained a telephone and a separate telephone number (N.T. 1099-1103), but also utilized the residence telephone of Nestor Peles (N.T. 473-474). The Corporation paid some phone bills of the officers, as they used their home telephones during the evenings for company business (N.T. 1074-1076). Pelbro had pre-printed stationery and envelopes evidencing its corporate existence (N.T. 1099-1103, Defendants' Exh. 32). Pelbro owned and utilized a corporate seal (N.T. 1120-1121, Defendants' Exh. 37).
Management and consulting services were provided from time to time to Pelbro and to Yellow Creek by PR & W, a partnership formed by Nestor Peles, Nicholas Rend and Robert Westrick In 1978 (N.T. 418, 421, 468, Plaintiffs' Exh. 11, p. 14). By corporate resolution, on September 19, 1978, Pelbro agreed to enter into a management arrangement with PR & W involving management services with regard to Pelbro's coal mines (Plaintiffs' Exh. 11, p. 14).
PR & W was strictly a management partnership. PR & W never owned or held a surface mining license or surface mining permits and was never involved in the production of coal (N.T. 1149-1150). PR & W was described by Robert Westrick as a "management partnership" (N.T. 417). PR & W maintained separate bank accounts (N.T. 89), reported its financial transactions through separate, independent partnership tax returns (Plaintiffs' Exh. 51-54) and maintained separate stationery (Defendants' Exh. 34). PR & W obtained and consistently utilized a separate federal tax identification number (Plaintiffs' Exh. 51-54). PR & W did not require a separate office, although its files and records were kept separate and apart from the Pelbro records (N.T. 1073-1074). The total of management fees or compensation paid by Pelbro to PR & W was $65,000, comprising a payment of $45,000 on November 25, 1979, $10,000 on April 9, 1980 and $10,000 on June 10, 1980 (N.T. 545-555, 558-559). The billings were based on time spent by PR & W, without any pre-arranged or set rate (N.T. 69-70). Following Robert Westrick's departure from Pelbro, PR & W was terminated and a successor partnership, Ren-Koe, formed at that time (N.T. 373). Very little management services were ever provided by Ren-Koe. The only fees paid by Pelbro to Ren-Koe consist of a single $3,000 payment on September 10, 1985 (N.T. 558-559).
*1552 A notation in Pelbro's records that Pelbro received commission income from PR & W was a bookkeeping error. Pelbro never received income from PR & W (N.T. 543-545).
When PR & W was first formed, the partnership was held in equal shares by Nestor Peles, Nick Rend and Robert Westrick. At a later point, ownership of PR & W changed to one-ninth Nestor Peles, one-third Nick Rend, one-third Linda Westrick (now Linda Kohut), one-ninth Stephen Peles and one-ninth Robert Westrick (N.T. 423).
The brunt of management services provided by PR & W were directed to management of Yellow Creek's operations. PR & W received management fees and compensation from Yellow Creek Coal Sales of $158,798.43 during calendar year 1979, $146,898.23 during calendar year 1980 and $223,006.00 during calendar year 1981. No management fees were ever paid by Yellow Creek to Ren-Koe.
Intermittent wages, salaries and similar compensation were paid by Pelbro from time to time to its officers. Aggregate wages, salaries and other compensation paid to officers from 1974 through 1981 were insubstantial.
Fair and reasonable compensation in the strip mining industry for experienced mining "superintendents" was in the vicinity of $75,000 during the time that Pelbro engaged in mining operations (N.T. 74). Managers of coal mining departments were customarily paid at least $50,000 yearly (N.T. 74-75). Although not as orderly or meticulous as the bookkeepers of PP & L or Ford Motor Company, the Pelbro officials nevertheless maintained extensive records evidencing the corporation's identity and separateness. Articles of Incorporation were filed with the Corporation Bureau of the Department of State of the Commonwealth of Pennsylvania (Plaintiffs' Exh. 1), minutes and resolutions were adopted with some regularity (Plaintiffs' Exh. 2, Plaintiffs' Exh. 11). Stock certificates were issued (N.T. 342-347, Plaintiffs' Exh. 14) and a formal stock register was maintained (Plaintiffs' Exh. 13). The corporation adopted By-Laws (Defendants' Exh. 16). The corporation maintained and filed substantial financial records, such as its federal income tax returns (Plaintiffs' Exh. 24, 29-41), Pennsylvania income tax returns and capital stock tax returns (Defendants' Exh. 18-30), financial statements (Plaintiffs' Exh. 19), depreciation schedules (Plaintiffs' Exh. 3-5) and employer's quarterly federal employee withholding returns, (Defendants' Exh. 31). Pelbro maintained separate bank accounts (N.T. 1191-1192). Pelbro obtained and consistently used a federal tax identification number (N.T. 1081-1085). Pelbro's records were kept separate and apart from any of the other business entities (N.T. 1073-1074). An examination of Pelbro's federal tax returns (Plaintiffs' Exh. 29-41) reveals that all landowner coal royalties were paid by Pelbro, all equipment repairs and maintenance costs were paid by Pelbro, Pelbro as an employer paid hospitalization and compensation insurance, salaries and wages, federal unemployment insurance, state unemployment insurance, workers compensation and occupational disease premiums and the like. Pelbro paid federal coal excise taxes (N.T. 1090-1091) and all reclamation fees required to be paid to the Department of Interior (N.T. 1092, Defendants' Exh. 35).
As earlier indicated, Pelbro's operations were extremely successful. On March 27, 1981, however, the National Bituminous Coal Wage Agreement of 1978 expired and all UMWA employees, including Pelbro's work force, walked-out en masse and engaged in a protracted strike (N.T. 1178, Defendants' Exh. 36). Although Pelbro's employees did not work during the strike, following the conclusion of the strike they dropped out of the Union (N.T. 1180) and, with the exception of two workers who had secured employment elsewhere, returned to work with Pelbro. Even though none of Pelbro's employees lost their jobs, the termination of the 1978 Bituminous Coal Wage Agreement on March 27, 1981, coupled with Pelbro's employees dropping out of the Union, resulted in the "withdrawal"[7] *1553 of Pelbro and the assessment by the Trustees of the Pension Plans of "withdrawal liability" against Pelbro.[8]
During the entire relationship between Pelbro, as an employer, and the Plans, as a pension plan, under both the 1974 and 1978 Bituminous Coal Wage Agreements (Defendants' Exh. 35 and 36) certain "contributions"[9] were required to be made to the pension plan, and could only be made to the pension plan by the employer[10]. At all times during the existence of these two elective bargaining agreements, all contributions due the Pension Plan were paid by Pelbro (N.T. 1122, Defendants' Exh. 38). The collective bargaining agreements were in the name of "Pelbro Fuel, Inc.", and were signed by Nestor Peles, as "President" (N.T. 1105-1107, Defendants' Exh. 35-36). In their Complaint filed against Pelbro in the United States District Court for the Western District of Columbia (Defendant's Exhibit 46, Paragraph 10) Pelbro was designated as the sole "employer". At no time during the course of the audit conducted by the Pension Plans was the status of Pelbro as the "employer" questioned (N.T. 1139-1142, Plaintiffs' Exh. 59), although the Pension Fund auditors suggested that their supervisors follow-up on the relationship between Pelbro and Yellow Creek (Plaintiffs' Exh. 59, p. 41).
By two separate written notices dated September 1, 1982, the Trustees of the Pension Plans wrote to Pelbro Fuel, Inc., advising Pelbro that Pelbro had "withdrawn" from any obligation to contribute to the Pension Plans, and that Pelbro had incurred "withdrawal liability" to the 1950 Plans and to the 1974 Plans (Plaintiffs' Exh. 9). By two separate written notices dated February 28, 1983, addressed to "Pelbro Fuel, Inc." the Trustees of the Plans advised Pelbro that the Plans had "assessed" the "withdrawal liability" of Pelbro to be $353,765.00 to the 1950 Plans and $123,704.23 to the 1974 Plans (Plaintiffs' Exh. 9.)[11] No written notice was ever sent by the Plaintiffs to the defendants informing the defendants that they were viewed as "employers", nor did plaintiffs ever notify defendants that they were liable for "withdrawal liability", nor was any "assessment" of "withdrawal liability" ever made by plaintiffs against defendants. The defendants never knew, nor did they believe that they were ever personally notified of any assessment or claim for withdrawal liability (N.T. 274-276, 283, 384, 387, 393-394).
At all times prior to the filing of this lawsuit, Pelbro and not the individual defendants, was recognized by both the UMWA and the Pension Plans as the "employer" (See Defendants's Exhibit 35, the National Bituminous Coal Wage Agreement of 1974; Defendants' Exh. 36, the National Bituminous Coal Wage Agreement of 1978; Plaintiffs' Exh. 59, the audit report of the Pension Plans: Defendants' Exh. 40, letter of March 2, 1981 from the Pension Plans to Pelbro; Plaintiffs' Exh. 9, withdrawal liability notices and assessments).
Plaintiff filed suit in the United States District Court for the District of *1554 Columbia against Pelbro, as the employer, upon a claim for "withdrawal liability" and obtained a judgment against Pelbro for withdrawal liability due on the date of "withdrawal"[12], March 27, 1981 (Plaintiffs' Exh. 10).
Although Pelbro suffered financially as a result of a shut-down of operations during the strike[13], the events that led to Pelbro's financial tail-spin came at a later point. Pelbro was forced to enter into a Consent Order during the summer of 1982, with the Department of Environmental Resources of the Commonwealth of Pennsylvania, directing Pelbro to engage in substantial backfilling operations which required Pelbro to pull heavy equipment, including the dragline, from its coal production operations and to devote the equipment and attendant man power to backfilling reclamation (N.T. 1186-1188). Of even greater concern, the rather consistent coal reserves that Pelbro had at the Brush Valley job, after overcoming the sulfur problems encountered during 1978-1979, came to an abrupt, totally unforeseen and catastrophic end. The coal seam worked by Pelbro suddenly lost its uniformity and its thickness (up to this point approximately 38 inches), rolling down to meager veins of six inches (N.T. 1184-1185). These "dips" and "rolls", or geologic faults which effectively resulted in a total, unexpected loss of its primary resource, was "disastrous" and beyond the "wildest dreams" (N.T. 1188) of Nestor Peles, Pelbro's president, and put Pelbro out of the coal business (N.T. 1188).
As with most any business enterprise, from time to time Pelbro borrowed (approximately 12-15 loans) from banks (N.T. 362), generally for equipment purchases, and from its shareholders (approximately 19 loans), generally to cover short-term operating expenses (Plaintiffs' Exh. 20, N.T. 362-363), and, on approximately 12 occasions (Plaintiffs' Exh. 22) borrowed from Yellow Creek, PR & W and Ren-Koe, also for operating expenses. Intermittent payments were made by Pelbro against the loans. Most of the loans from the shareholders, Yellow Creek, PR & W and Ren-Koe, were not documented through formal notes or loan instruments, although all of the loans were designated as "Loans" on the deposit records of Pelbro (N.T. 1191-1192, Defendants' Exh. 44) at the time the loans were made, and recorded as such on the books and records of Pelbro. No interest was paid on the shareholder loans (N.T. 20-21). The shareholders, from time to time, pledged personal assets with the Commonwealth of Pennsylvania to enable Pelbro to obtain strip mining bonds (N.T. 351). At the end of Pelbro's fiscal year ending 8/31/82, the Corporation was indebted to Nestor Peles for unpaid shareholder loans in the amount of $82,000. Substantial shareholder loans, totalling $220,400 (Plaintiffs' Exh. 21) were made to Pelbro by the shareholders (and by PR & W) during Pelbro's next fiscal year ending 8/31/83 (Plaintiffs' Exh. 21). These loans were necessitated by extraordinary backfilling costs incurred by Pelbro resulting from an order or directive issued by the Pennsylvania Department of Environmental Resources (N.T. 1188-1199), and as a result of a catastrophic, sudden deterioration of its coal reserves (N.T. 1184-1185). The loans were made to enable Pelbro to comply with the backfilling order, at a time when its coal production had sharply declined. On July 20, 1983, and July 31, 1983, Pelbro issued five (5) Notes (Defendants' Exh. 45) to the shareholders and PR & W documenting the Loans (N.T. 1200-1202). That the loans were actual loans involving monies paid directly to Pelbro is not in dispute.
Although Pelbro recovered from the serious economic losses sustained during the strike, the backfilling order and the loss of the coal reserves that surfaced during the *1555 summer of 1982, left Pelbro with a minuscule net operating profit of $2,553.42 for its fiscal year ending 8/31/82 (N.T. 1181-1182, Plaintiffs' Exh. 37). During the following three fiscal years ending 8/31/83, 8/31/84 and 8/31/85, Pelbro recorded net operating losses of, respectively, $189,151.75, $134,150.75 and $102,798.29 (Plaintiffs' Exh. 38-40). Pelbro had no gross receipts during its fiscal year ending 8/31/86 (Plaintiffs' Exh. 41).
During Pelbro's fiscal years ending 8/31/84 and 8/31/85, Pelbro's mining equipment and other depreciable assets were, in very large part, "removed" from its depreciation schedules. The disposition of the equipment and other depreciable assets "removed" from the financial statements, whether the items were the result of voluntary or involuntary dispositions, can be grouped into certain categories:
1) In-kind repayments of loans/compensation;
2) Sales:
3) Bank repossessions;
4) Junked property, trade-in's and miscellaneous dispositions.
Pelbro transferred its dragline to PR & W, Linda Kohut, Nicholas and Debra Rend, Stephen Peles and Nestor Peles on September 17, 1983 (N.T. 270-271, Plaintiff's Exhibit 8) in consideration of loans previously made by these parties to Pelbro totalling $373,383.73 (N.T. 378). The transfer of the dragline resulted in a cancellation of the indebtedness of Pelbro to these parties for the loans previously made (N.T. 1200-1202) and the Notes (Defendants' Exh. 45) previously issued by Pelbro on the loans. The corporate minutes (Plaintiffs' Exh. 11, p. 24, dated September 17, 1983) reflect the payment to be in cancellation of the indebtedness of Pelbro to these parties. Prevailing market prices for this type of dragline was determined to be between $350,000 and $400,000 (N.T. 378), through market quotations obtained from equipment sales companies and equipment dealers (N.T. 377) at the time of the transfer. The dragline was later sold by these parties on May 15, 1984 (N.T. 273, Plaintiffs' Exh. 7) to an unrelated party for the sum of $430,000 (N.T. 273, 381). A number of motor vehicles (N.T. 331-332, Plaintiffs' Exh. 12) were transferred to Defendants. Earlier corporate minutes dated July 18, 1983, indicate that the motor vehicles were transferred by Pelbro to the shareholders as partial payment against shareholder loans (N.T. 334-335, Plaintiffs' Exh. 11, p. 20). Later corporate minutes dated January 8, 1984, reflect that the motor vehicles were transferred by Pelbro to the shareholders as compensation to the shareholders for services rendered to the corporation (N.T. 588-593, Plaintiffs' Exh. 11, p. 35).
On September 5, 1984, Pelbro sold a Model 475 Loader to Peles Coal Company, an unrelated entity owned by the brother of Nestor Peles, for the sum of $65,000, for which Pelbro received full payment and which funds were deposited into the corporate bank account (N.T. 230-231, Plaintiffs' Exh. 11, p. 31). Pelbro sold a Caterpillar D-3 bulldozer on March 31, 1984 to an unrelated party at a sales price of $8,500 (N.T. 687), and effected sales of other assets noted on corporate records (N.T. 1220). The funds derived by Pelbro from these equipment sales were utilized by Pelbro for miscellaneous expenses such as payroll, payroll taxes, capital stock tax, worker's compensation, mine supplies, fuel, utilities, land reclamation and such (N.T. 578-580). The purchase price received by Pelbro from the sale of these assets was deposited into Pelbro's bank account and expanded by Pelbro for general operating costs. Land itemized as a depreciable asset, previously "purchased" by Pelbro from an individual named Darryl Evans at a purchase price of $46,000 (N.T. 1276-1290, Defendants' Exh. 47) was deeded back to Darryl Evans without receipt of consideration by Pelbro, even though the deed recited a nominal consideration of $2,200 (N.T. 1276-1290, Defendants' Exh. 48). The Evans land transactions, in substance a lease, involved the equivalent of a prepayment or "advance royalty" by Pelbro to Darryl Evans, and was structured in the form of a "sale" for tax purposes and to provide protection to Pelbro (N.T. 1276-1290).
*1556 A number of items of heavy mining equipment (bulldozers and loaders) were the subject of a bank repossession (N.T. 359-360) by National Bank of the Commonwealth (Plaintiffs' Exh. 16). The repossessions involved Caterpillar D9, H.D. 31 and Fiat bulldozers, and Caterpillar 988 loaders. A loan obligation of Pelbro to the bank, secured by these items of mining equipment was cancelled by the bank following the repossession (N.T. 572-577).
A substantial number of items of equipment and other depreciable assets appearing on the depreciation statements of Pelbro (Plaintiffs' Exh. 3-4) that were "written off" during Pelbro's fiscal years ending 8/31/85, had actually been "traded" or other equipment, "lost" or "junked" (N.T. 1210-1211, 1218), such as "communications equipment" (N.T. 694-695), "electrical equipment" (N.T. 695-696), "tools and fuel tanks" (N.T. 697). Certain of the items on the depreciation schedules are still held by Pelbro, such as furniture and office equipment. Certain other separately listed depreciable items, confusingly designated as "capital repairs" were actually "repairs" and "parts" on existing mining equipment (N.T. 703-708), capitalized by Pelbro and depreciated, and disposed of with the item of mining equipment on which the repairs and parts were made (examples set forth on the depreciation statements are "power trains", "drag bucket" and "new drive" (N.T. 703-708).
Not all of the items of equipment or other depreciable assets that were "written off" during Pelbro's fiscal years ending 8/31/84 and 8/31/85 were actually disposed of during these periods.

LEGISLATIVE HISTORY OF WITHDRAWAL LIABILITY
Under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. ง 1001, et seq. (1976), amended by 29 U.S.C. ง 1301, et seq. (1982), employers contribute to a pension plan on behalf of each of their employees who is a member of a participating union. The amount of the payments (referred to as "contributions") is determined by a collective bargaining agreement between each employer and its employees. The plan is administered by trustees. The trustees set the level of benefits paid to participants and determine investment policy. United Retail & Wholesale Emp. v. Yahn & McDonnell, 787 F.2d 128 (3rd Cir.1986). Certain distinctions were drawn between pension plans maintained by single employers and "multiemployer" plans, e.g., those pension plans administered for the benefit of the employees of two or more employers, such as the United Mine Worker pension plans. Pension Benefit Guaranty Corporation v. Gray & Co., 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984).
The Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. ง 1381, et seq. (1980), was adopted to discourage withdrawals from multiemployer pension plans. United Retail & Wholesale Emp., supra, at 130. Multiemployer plans deal with a diverse contribution base, e.g., the pension plan is funded with contributions from a number of different employers in a multi-state setting. Withdrawal liability was enacted "... to compensate for the shrinkage of the contribution base that occurs when the number of employees on whose behalf contributions are made decreases". Pension Benefit Guaranty Corp. v. Gray & Co., supra. As noted in Central States Southeast and Southwest Areas Pension Fund v. Bellmont Trucking Company, Inc., 788 F.2d 428 (7th Cir. 1986).
"The contributions base of a pension plan depends upon the number of covered jobs with respect to which contributions are being made. If an employer goes out of business and its operations cease, presumptively, at least the total number of jobs with respect to which contributions are being made is reduced, regardless whether some of all the former employees of the defunct employer find employment in other covered enterprises. This presumptive loss of jobs overall would seem to be economically relevant factor that supplies the rationale for withdrawal liability."
*1557 Under MMPPA a withdrawing employer[14] is required to pay its share of the presumptive "shortfall". This payment is known as "Withdrawal Liability". The statute further provides that the amount of withdrawal liability is calculated by the trustees of the pension plan. Under MMPPA, a withdrawing employer becomes liable on the date of withdrawal for a proportionate share of the "unfunded" vested liability of the pension plan.
The mandatory nature of liability has been critized by many courts. See, United Retail & Wholesale Emp. v. Yahn & McDonnell, supra, and Keith Fulton & Sons, Inc. v. New England Teamsters and Trucking Industry Pension Fund, Inc., 762 F.2d 1137 (1st Cir.1985). For Instance, it is immaterial when the plans' liabilities were accured, and immaterial as to whether the employees of the withdrawing employer resume employment with a different employer covered by the same multiemployer plan. The "unwise" or "unlucky" investment strategies of the pension plan that affect the financial condition of the fund are likewise immaterial. As noted in Peick v. Pension Ben. Guaranty Corp., 539 F.Supp. 1025 (N.D.Ill., E.D.1982), as a general rule "... once an employer parts with its contribution, it retains no rights thereafter to determine how that money should be spent."
Once an employer's withdrawal liability is calculated, the plan is required to notify the employer in writing of the liability and demand payment on an installment schedule. 29 U.S.C. ง 1399(b)(1). After the employer receives written notice of withdrawal liability, it may, within ninety (90) days, ask for a review by the trustees of the plan. 29 U.S.C. ง 1399(b)(2)(A). After a "reasonable review", the trustees must notify the employer of their determination. 29 U.S.C. ง 1399(b)(2)(B). If a dispute persists, either party may initiate arbitration proceedings, 29 U.S.C. ง 1401(a)(3)(A). The arbitrators decision is further subject to review in a district court. 29 U.S.C. ง 1401(c).

ERISA STANDARDS
Under ERISA, only an "Employer" is liable for withdrawal liability, 29 U.S.C. งง 1301, 1391; Connors v. Darryll Waggle Const. Inc., 631 F.Supp. 1188 (D.D.C.1986); Combs v. Sun-Up Coal Company, Inc., 634 F.Supp. 13 (D.D.C.1986); Operating Engineers Pension Fund v. Reed, 726 F.2d 513 (9th Cir.1984); Paperworkers Pension Plan v. Arlington Sample Book Co., No. 83-2828, slip op. 1984 WL 6625 (E.D.Pa., 1984); Connors v. B.M.C. Coal Company, 634 F.Supp. 74 (D.D.C.1986); and Combs v. Indyk, 554 F.Supp. 573, 575 (W.D.Pa.1982). Under the "alter ego" theory of "piercing the corporate veil", the corporation is deemed but a sham, an entity that substantively exists on paper only, leading to a disregard of the corporate fiction in cases where the separate personalities of the corporation and the individuals do not exist. Plaintiffs, defendants and this Court have heretofore recognized that the Third Circuit has promulgated a number of factors deemed relevant to a determination of when to pierce the corporate veil. Solomon v. Klein, supra, an action under ERISA with respect to pension contributions arising out of a collective bargaining agreement, outlines the relevant factors as:
"... the failure to observe corporate formalities; non-payment of dividends; the insolvency of the debtor corporation at the time; siphoning of funds of the corporation by the dominant stockholder; nonfunctioning of other officers or directors; absence of corporate records; and the fact that the corporation is merely a facade for the operation of the dominant stockholder or stockholders (citations omitted)." 770 F.2d at 353, 354.
The principles enunciated in Solomon v. Klein, supra, were adopted by the Third Circuit as a result of their prior decision in United States v. Pisani, 646 F.2d 83, 88 (3rd Cir.1981), and in part from a decision of the Fourth Circuit in DeWitt Truck Brokers, Inc. v. W. Ray Flemming Fruit Co., 540 F.2d 681 (4th Cir.1976).
*1558 Other factors viewed as relevant by other courts in determining whether to pierce the corporate veil under an alter ego theory are (1) "commingling of funds", Zubick v. Zubick, 384 F.2d 267, 270 (3rd Cir.1967); Seymour v. Hull & Moreland Engineering, 605 F.2d 1105, 1112 (9th Cir.1979), Wolfe v. United States 798 F.2d 1241 (9th Cir.1986), (2) "gross undercapitalization", viewed by most courts as perhaps the single most important factor, a point obviously recognized by plaintiff given the extent of their focus upon the capitalization of Pelbro at trial. See DeWitt Truck Brokers, supra, Seymour, supra, American Bell, Inc. v. Federation of Telephone Workers of Pennsylvania, 736 F.2d 879 (3rd Cir.1984), Laborers Clean-up Contract Administration Trust Fund v. Uriarte Clean-up Service, Inc., 736 F.2d 516 (9th Cir.1984), (3) a "fraudulent intent behind incorporation", Laborers Clean up, supra, at 524-525, Zubick, supra, 384 F.2d at 273, Seymour, supra 605 F.2d at 1113, (4) "recent incorporation" before the date of the liability, Zubick, supra, 384 F.2d at 274 fn. 16, Seymour, supra, 605 F.2d at 1113, (5) whether the liability of the corporation as a result of "bad financial times", as opposed to an initial scheme to avoid personal liability, Seymour, supra, 605 F.2d at 1113, and (6) "reliance" of a creditor upon the financial standing or creditworthiness of the corporation.
An analysis of the facts adduced before this Court at trial will be presented in short order.
No single factor is, of course, determinative. A balancing approach is to be employed, and the weight of all of the factors important. Mobler v. Braverman, 669 F.Supp. 592, 594 (S.D.N.Y.1987); Parker v. Bell Asbestos Mines, Ltd., 607 F.Supp. 1397 (E.D.Pa.1985). The determinative factor is whether, applying all of the applicable tests, the corporation is a "dummy" for its individual stockholders.

PLAINTIFFS' THEORY OF LIABILITY
This action, initially comprised of three separate counts, each alleging a separate theory of liability, was originally commenced by the plaintiffs by the filing of a Complaint in state court (Court of Common Pleas of Indiana County, Pennsylvania). The action was removed by Defendants to District Court, and followed by a Motion to Dismiss. Count I advanced a theory of personal liability of the Defendants, as officers and directors of Pelbro, under ERISA and the LMRA. Count II advanced a similar theory, but alleged the underlying liability to arise under a state statute imposing liability upon officers and directors of a corporation, under certain circumstances, for the debts of the corporation.
Following briefing and argument, this Court dismissed Counts I and II primarily as a result of decisions squarely on point out of the Third Circuit. In Solomon v. Klein, 770 F.2d 352 (3rd Cir.1985), discussed at greater length infra., the Third Circuit ruled categorically that absent allegations of an "alter ego" theory of piercing the corporate veil,[15] there is no liability under ERISA or the LMRA of officers and directors of a corporate signatory to a collective bargaining agreement for delinquent contributions or withdrawal liability. For this reason, Count I of the Complaint was dismissed. Count II was dismissed following the reasoning of the Third Circuit in McMahon v. McDowell, 794 F.2d 100 (3rd Cir.1986), which declared that state law claims for fringe benefits and pension contributions have been preempted by ERISA. As a result, Count II was dismissed following argument before this Court.[16] Defendants further moved to dismiss *1559 Count III of the Complaint, upon the theory that Plaintiffs failed to provide Defendants with statutory notice under ERISA of a demand for payment of withdrawal liability. Following the filing of an amended complaint, this Court denied Defendants' Motion to Dismiss, reserving a determination until the issues were more fully developed at trial.
An analysis of Count III of the amended complaint, reveals that the claim set forth therein, closely parallels the standards for review of an "alter ego" case under ERISA established by the Third Circuit in Solomon v. Klein, supra. Paragraph 26 of the amended complaint contains a summary of the factors outlined by the Third Circuit. Solomon v. Klein, supra, at 353-354.
Paragraph 27 presents the parameters of the claim through Plaintiffs assertion that:
Defendants ... were the alter ego of Pelbro, and as such are jointly and severally liable to the plaintiffs for the withdrawal liability. (emphasis supplied)
The sole remaining claim of Plaintiffs presented at trial must thus be decided solely upon the single legal theory of whether Defendants were, at the date of imposition of withdrawal liability, the "alter ego" of Pelbro and thus liable for the withdrawal liability of Pelbro.[17]

STANDARD OF REVIEW
Plaintiffs have "the burden of establishing, by a preponderance of the evidence, that the corporation was an artifice and a sham designed to execute illegitimate purposes in abuse of the corporate fiction and the immunity that it carries ..." (citations omitted), Zubick, supra, 384 F.2d at 270, fn. 2. The decision of a court to pierce the corporate veil, though, is to be exercised reluctantly and cautiously. DeWitt Truck Brokers v. W. Ray Flemming Fruit Company, supra, 540 F.2d at 683.

THE FACTUAL TIME PERIOD WHICH SHOULD BE ADDRESSED BY THIS COURT IN DETERMINING THE EXISTENCE OF AN "ALTER EGO" TO PELBRO
Of critical importance to any determination of the existence of an "alter ego" setting so as to justify a piercing of the corporate veil, is an inquiry as to the time at which such determination must be made.
Pelbro was incorporated in 1973. Should the inquiry focus upon corporate affairs at the date the charter was issued by the Department of State of the Commonwealth of Pennsylvania? Certainly not, for although Pelbro was incorporated on September 19, 1973, it remained inactive until early to mid 1974, many months after the date of incorporation. Furthermore, Joseph J. Peles, one of the two original incorporators, transferred his stock to Nestor Peles prior to the date at which Pelbro commenced operations. Also, Pelbro did not sign a collective bargaining agreement with the UWMA until October 26, 1976. Defendants contend that the most logical date for a determination of an "alter ego" setting, would be the date that the liability of the corporation to the UMWA Pension Fund for withdrawal liability arose, e.g., the date of "withdrawal", as determined under ERISA.
For purposes of determining when withdrawal liability arises, 29 U.S.C. ง 1383(a) sets out the factors which indicate a complete withdrawal:
"For purposes of this part, a complete withdrawal from a multiemployer plan occurs when an employerโ
1) permanently ceases to have an obligation to contribute under the plan, or
2) permanently ceases all covered operations under the plan (emphasis supplied)."
*1560 It is crystal clear that the date at which Pelbro "ceased to have an obligation to contribute" to the Pension Fund, was March 27, 1981. Paragraph 11 of Plaintiffs' Amended Complaint states that the National Bituminous Coal Wage Agreement of 1978 expired on March 26, 1981, and that after that date Pelbro had not been signatory to any collective bargaining agreement that would require it to make contributions to the Pension Fund. Paragraph 12 of the amended complaint states that, as a result of the cessation of an obligation to contribute to the Pension Fund, Pelbro has incurred a "complete withdrawal" under 29 U.S.C. ง 1383(a).
Events transpiring subsequent to March 27, 1981 are not germane to a determination of who the "employer" actually was at the time that a "withdrawal" occurred under ERISA.[18]
Otherwise, plaintiffs' "piercing the corporate veil" theory would be transformed into a separate legal claim under the "Avoidance" statutes of ERISA, 29 U.S.C. ง 1392(c), a claim that has not been pleaded. In Chicago Florsheim Shoe v. Cluett, Peabody & Co., 826 F.2d 725 (7th Cir.1987), the issue of the date of inquiry was presented in an "alter ego" or "piercing the corporate veil" case. There, Florsheim sought to impose liability upon the parent corporation of a subsidiary for the breach of a contract entered into while the parent controlled the subsidiary, but where the contract violation occurred after the date that the parent corporation sold the subsidiary. The Court there focused upon the date of the event giving rise to the liability, e.g. the breach of contract, as opposed to an earlier date at which the parent was alleged to have manipulated the subsidiary. The court noted that:
"It is apparent that Florsheim's piercing theory is merely an attempt to shape what is obviously a fraudulent conveyance argument ... into a cause of action distinct from Lytton's bankruptcy proceedings. ..." 826 F.2d at 727-728.
As in the Florsheim case, this court must focus on the nature of the legal theory advanced (here, an "alter ego" theory) with the liability sought to be imposed (here, "withdrawal liability"). The plaintiffs have alleged in their pleadings that defendants are liable for withdrawal liability because their "sham" corporation withdrew from the pension plan on March 27, 1981. The conduct of the defendants, the operations of the corporation and events leading up to, and triggered by the strike of March 27, 1981, should thus be examined.
Defendants contend that this Court should look at these circumstances during the terms of the collective bargaining agreement between defendants and the UMWA (October 27, 1976 through the date of withdrawal, March 27, 1981). The rationale for concluding that the date of inquiry of whether Pelbro was a bona fide business corporation or, as plaintiffs suggest, a sham and artifice, should be made upon the date of withdrawal, is highlighted by Plaintiffs' allegations in paragraphs 2 to 5 of their amended complaint, that defendants were "at all times material hereto" officers, directors and shareholders of Pelbro, and in paragraphs 13 and 14 of the amended complaint, whereby plaintiffs allege that the withdrawal liability was incurred "as a result of" the complete withdrawal. This makes sense. The "withdrawal" arose out of the collective bargaining agreements!
In Godchaux v. Conveying Techniques, Inc., 846 F.2d 306 (5th Cir.1988) the issue of the date at which "withdrawal liability" should be determined was discussed. The court there had no trouble in reaching the conclusion that "withdrawal liability does not exist until an employer actually withdraws from the multiemployer pension plan" 846 F.2d at 310. The Court there rejected an argument that a determination should have been made at the date that the Pension Fund developed an unfunded vested *1561 liability and ruled that the date of withdrawal was the only pertinent date.
The crux of the Plaintiffs' claim is an obligation to pay a pro-rata share of an unfunded vested liability of the pension fund, calculated by plaintiffs utilizing the March 27, 1981 withdrawal date. To impose the responsibility for the payment of "withdrawal liability" resulting from an "employer's withdrawal" on March 27, 1981, upon later events would be improper, especially in this case, as that relationship ceased on March 27, 1981. The withdrawal liability statutes tell us that once a "withdrawal" has occurred, and "withdrawal liability" results, that the liability is absolute and should present nothing more than a collection process.
To be sure, circumstances may exist from time to time, where events or transactions post-dating the date of "withdrawal" may be important, such as in an action brought by a pension fund to recoup assets in a fraudulent conveyance scheme under the "Avoidance" statutes of ERISA, 29 U.S.C. ง 1392(c), and in such a setting the transfers may be treated akin to "preferences" under the Bankruptcy Code. As in a preference transaction in bankruptcy litigation, or a transaction to upset a conveyance under a state fraudulent conveyance act, no personal liability is visited upon the recipient of the assets. Plaintiffs have not filed these types of claims against Defendants and they are not before the Court. In fact, Plaintiffs have admitted in their Paragraph 3 of Motion to Amend Pleadings to Conform To The Evidence, submitted during the trial of this case and rejected by the Court, that the legal doctrine upon which their case is founded, is the "alter ego" doctrine. This is a case involving a claim of personal liability of Defendants for the withdrawal liability of the corporation only, under an "alter ego" or "piercing the corporate veil" theory.

APPLICATION OF THE REQUIRED ALTER EGO FACTORS TO THE FACTS OF THIS CASE
The factors germane to a review of an "alter ego" claim as illustrated in Solomon v. Klein, et al., discussed above, will be analyzed hereafter in the context of the facts established at the trial of this matter.
1. Gross Undercapitalization. One of the most compelling factors, applicable to all types of corporations, in judging whether or not to retain limited liability is that of the adequacy of the capitalization of the enterprise." Carp. Hlth. & Welfare Fund v. Ambrose, 727 F.2d 279, 284 (3rd Cir.1983); Gillespie, The Thin Corporate Line: Loss of Limited Liability Protection, 45 N.D.L.Rev. 363 (1969). The standard in the Third Circuit is gross undercapitalization. United States v. Pisani, 646 F.2d at 88; DeWitt Truck Brokers, supra 540 F.2d at 685-686, endorsed by the Third Circuit in the Pisani and Solomon v. Klein, decisions, and American Bell, Inc. v. Federation of Telephone Workers of Pennsylvania, 736 F.2d 879, 886 (3rd Cir. 1984). Indeed, Plaintiffs certainly recognize the importance of this factor, given the extent of trial time devoted to the topic.
The nature of Pelbro's capital stock structure initially clouded the issue. Pelbro was incorporated with an authorized issue of 250,000 shares of common stock, without par value. To further complicate the issue, Pelbro elected to be treated, and was treated by the Internal Revenue Service, as a "cash basis" taxpayer. Pelbro consistently maintained its books and records on a cash basis. The initial paid-in cash capital reflected on Pelbro's books was thus a token figure ($2,000). Because Pelbro was a cash basis taxpayer, however its books and records did not reflect the value of substantial assets acquired by the corporation. For instance, Defendants believe that the evidence clearly established that two groups of coal leases (Defendants' Exh. 4-12) acquired by Pelbro (covering the "Penn Run" job and the "Brush Valley" job) had exceptional value. The leases covered in excess of 1,000 acres. The value of the "Penn Run" leases alone was estimated by Nestor Peles and by Pelbro's accountant, that conservative pre-mining values, to be worth between $100,000 and $125,000. Pelbro was not required to pay for the coal rights at the time they were acquired. *1562 Rather, the arrangements involved the payment of a "royalty" to the property owners as coal was extracted. Because Pelbro was a cash basis taxpayer, the "value" of the coal rights was not noted on Pelbro's books.
Even a cursory review of Pelbro's "gross revenues" over the years (Plaintiffs' Exh. 24, 29-41) indicate that the coal leases were of exceptional value. It is true that Pelbro commenced business with little start-up cash capital. However, the inherent value of the coal leases enabled Pelbro to readily meet its obligations and to immediately transform the inherent value of the coal rights into substantial working capital, equipment and other assets. Pelbro's operations were quite different than the circumstances presented in DeWitt Truck Brokers v. W. Ray Flemming Fruit Company, supra, where the corporation "... was actually operating at all times involved on someone's elses capital." 540 F.2d at 688. Additionally, Pelbro's tax returns and financial statements do not fairly portray the value of Pelbro's extensive mining equipment, in that the values shown therein are depreciated values, e.g., most of the equipment had fair market value in excess of its remaining depreciation basis.
We look at Pelbro's retained earnings (Plaintiffs' Exh. 42) from its initial fiscal year ending August 31, 1974, even through the onset of the events precipitating its downfall, i.e. the backfilling and reclamation order and the and the loss of its coal reserves in 1982, substantiates that Pelbro was adequately capitalized at all material times. Pelbro's retained earnings throughout these years indicate the following:

 FYE RETAINED EARNINGS
 8/31/74 $ 92,228.62
 8/31/75 205,496.48
 8/31/76 34,258.01
 8/31/77 6,933.01
 8/31/78 53,109.23
 8/31/79 4,616.29
 8/31/80 145,457.92
 8/31/81 220,311.18
 8/31/82 222,864.60

Pelbro's operating history through the date of "withdrawal" on March 27, 1981, is substantially different than that presented in Pisani, where the corporation was continuously undercapitalized. 646 F.2d at 85, 88.
Defendants submit that the factor of gross undercapitalization did not, if at all, present itself until such time as Pelbro encountered the catastrophic "fault" in the Brush Valley job coal seam during the summer of 1982.[19]
As noted by the Court during trial, "nothing succeeds like success". To say that Pelbro was grossly undercapitalized, at least until long after the date of "withdrawal" and the resulting "withdrawal liability" on March 27, 1981, is to ignore reality.
2. Nonpayment of Dividends. A second factor recognized by the courts is the inability or failure of a corporation to pay dividends. The nonpayment of dividends has been universally declared to be a factor that support an "alter ego" setting that justifies "piercing the corporate veil". Solomon v. Klein, supra, 770 F.2d at 354, DeWitt Truck Brokers v. W. Ray Flemming Food Company, supra 540 F.2d at 686-687, American Bell, Inc. v. Federation of Telephone Workers of Pennsylvania, 736 F.2d at 886, United States v. Pisani, 646 F.2d at 88.
Dividends were paid by Pelbro during its first fiscal year ending August 31, 1974, although the corporation had been in business but a very few months. (Plaintiff's Exh. 42, Defendant's Exh. 3). Dividends were paid by Pelbro during each of its next succeeding seven (7) fiscal years, through fiscal year ending August 31, 1981 (Plaintiff's Exh. 42, Defendants' Exh. 3). Circumstances here are drastically different than that presented in DeWitt Truck Brokers v. W. Ray Flemming Fruit Company, supra, where the Court noted that the "... inability of the corporation to pay a dividend is persuasive proof of this want of capital". 540 F.2d at 688. See also, United States v. Pisani, supra, 646 F.2d at *1563 85-88, where dividends were never paid by the corporation.
As earlier noted, Pelbro's last signatory contractual arrangement with the UMWA ended with the strike of March 27, 1981, the date of Pelbro's "withdrawal" and the date of the calculation by plaintiffs of the "withdrawal liability" of Pelbro. Taking a "looking glass" approach to the corporate setting, the factor of "nonpayment of dividends was totally absent during the eight (8) fiscal years ending with the date of Pelbro's withdrawal.
3. Nonfunctioning of Other Officers or Directors. A third standard applied by the courts to a determination of the propriety of piercing the corporate veil, is whether the officers and directors of the corporation played any legitimate function, or whether they were but figureheads or token office holders. Solomon v. Kline, supra, 770 F.2d at 354; DeWitt Truck Brokers, Inc., v. W. Ray Flemming Fruit Company, supra, 540 F.2d at 686-687; United States v. Pisani, supra, 646 F.2d at 686-687; United States v. Pisani, supra, 646 F.2d at 88: American Bell, Inc. v. Federation of Telephone Workers of Pennsylvania, supra, 736 F.2d at 886.
This factor should, in the instant case, either be disregarded as irrelevant or decided in favor of Defendants. The relevancy of this factor in the instant case is questionable. It is clear that Defendants, Nestor Peles, Stephen Peles and Nicholas Rend all played a substantial and continuing role in the corporate affairs and the conduct of its day-to-day business. Nestor Peles, its President, served as the general supervisor of all field and business matters and, essentially, was the chief executive officer and figurehead of the corporation. Nicholas Rend directly supervised the coal extraction operations, and was in charge of mine safety. Stephen Peles was responsible for supervision of machinery and mechanical repairs. Each of these individuals were initimately involved in the business of the corporation.
On the other hand, Defendant Linda Peles Kohut, although a shareholder in Pelbro, had nothing to do with the day-to-day operations of the business, never served as a director, and held the office of secretary for only a brief period of time, from March 5, 1974 to September 17, 1974 (Plaintiffs' Exh. 11, pp. 3, 7). On the other hand, Robert Westrick was a shareholder of Pelbro, served as Secretary of Pelbro from September 17, 1974 (Plaintiffs' Exh. 11, p. 7) through October 21, 1981 (Plaintiffs' Exh. 11, p. 18), and was primarily responsible for bookkeeping and similar functions until he sold his interest in the corporation in 1952.[20] Westrick, for unexplained reasons, was never named as a party defendant to this lawsuit.
The relevance of the factor of "nonfunctioning of other officers or directors" is questionable in the content of a small, closely held corporation. In this case, with the sole exception of the time during which Linda Peles Kohut served as secretary of the corporation, all of the officers and directors fulfilled substantial and meaningful functions on behalf of the corporation, were privy to its day-to-day affairs and were more than token or figurehead functionaries.
4. Failure to Observe Corporate Formalities. The failure of the principals to observe basic corporate formalities is yet another factor that is determinative of personal liability. Solomon v. Kline, supra, 770 F.2d at 353-354; DeWitt Truck Brokers v. W. Ray Flemming Fruit Company, supra, 540 F.2d at 686; United States v. Pisani, supra, 646 F.2d at 88; American Bell, Inc. v. Federation of Telephone Workers of Pennsylvania, 736 F.2d at 886.
A degree of informality in the conduct of corporate affairs in the context of a small, closely held corporation is acceptable. Seymour v. Hull & Moreland Engineering, 605 F.2d 1105, 1112 (9th Cir.1979).
As established at trial, Defendants submit that Pelbro, and its officers, directors and shareholders, did in fact observe the basic corporate formalities necessary to create and maintain the separate corporate identity of Pelbro. The company maintained *1564 a registered office as required by the Business Corporation Law of Pennsylvania (N.T. 1069). Articles of Incorporation were filed with the Department of State of the Commonwealth of Pennsylvania (Plaintiffs' Exh. 1). By-laws (Defendants' Exh. 16) were adopted, and stock certificates were issued to the shareholders (Plaintiffs' Exh. 14). Cf., the holding in Laborers Clean-up Contract Administration Trust Fund v. Uriart Clean-up Service, Inc., supra, where stock was never issued by the corporation to its shareholders. 736 F.2d at 524. Corporate meetings were conducted with some degree of regularity (Plaintiffs' Exh. 2, 11). See DeWitt, supra where corporate meetings were never held. 540 F.2d at 688. To be sure, Pelbro did not maintain a suite of plush offices as their "boardroom", and meeting were often held in their homes and in the field, as well as in the office.
Directors and officers were elected, unlike the circumstances presented in Maritime Ventures Int., Inc. v. Caribbean Trading & Fidelity Ltd., 689 F.Supp. 1340, 1349 (S.D.N.Y.1988), and identified in their official capacities on many, many documents. A corporate minute book, seal and stock ledger were acquired and maintained, albeit with some degree of informality and with, perhaps the degree of sophistication more common to coal operators than to attorneys and accountants. Pelbro maintained offices, had a business telephone and stationery (Defendants' Exh. 32).
Pelbro applied for and obtained a federal tax identification number (Plaintiffs' Exhs. 24, 29-41), and regularly filed federal, state and employers tax returns. The corporation maintained federal and state unemployment compensation insurance and regularly filed its returns (N.T. 1088-1089). Federal coal excise tax returns (N.T. 1091-1092) and federal office of Surface Mining reclamation returns (N.T. 1092, Defendants' Exh. 35) were routinely filed. The corporation at all times maintained workers compensation insurance and occupational disease insurance, and regularly submitted these returns (N.T. 1094-1095).
The assets utilized by Pelbro in the conduct of its business were titled in Pelbro's name, not in the name of any nominee, nor was any subterfuge employed to mask the ownership of the assets.
None of the numerous "formalities" discussed herein may alone be considered. The overall picture is determinative. For instance, in Seymour v. Hull & Moreland Engineering, supra, 605 F.2d at 1112, there was evidence that no more than four corporate meetings were held during the history of the Corporation, yet the Court noted that other factors were present that indicated that basic corporate formalities were generally observed. Cf., the result in Pisani where few, if any, corporate formalities were observed. 646 F.2d at 85, 88.
It is readily apparent that, albeit with some degree of informality, that the basic formalities required of a business corporation were followed by the officers and directors of Pelbro.
5. Facade for the Operations of Dominant Shareholders. The Courts have viewed instances where the dominant shareholders have employed the corporation as a "facade" or "sham" for their personal activities, as but yet another factor to be considered in a determination of whether to pierce the corporate veil. Solomon v. Klein, supra, 770 F.2d at 354; DeWitt Truck Brokers v. W. Ray Flemming Fruit Company, supra, 540 F.2d at 687.
Perhaps the most dispositive point in the discussion as to whether Pelbro was operated as a sham, as a facade for the operations of its shareholders, is the fact that title to all of the assets utilized by Pelbro in the conduct of its operations, was at all times with Pelbro. All of the coal leases were transferred to the corporation at the onset. All of the heavy mining equipment, including draglines, bulldozers and motors were titled in the corporation's name. This is not the case where a shell corporation has been formed, for the purpose of engaging in a sham leasing transaction of necessary assets from its shareholders, who acquire and continue to own the property so as to immunize the assets in the event of *1565 business misfortune. A cursory review of Pelbro's tax returns reveals that this is not the case.
Furthermore, as noted in greater detail later in this brief, there was no commingling of funds between Pelbro and its shareholders. Cf., Zubick v. Zubick, supra, 384 F.2d at 272.
Pelbro at all times held a valid surface mining license issued by the Department of Environmental Resources of the Commonwealth of Pennsylvania (Defendants' Exh. 42) and all mining permits authorizing strip mining on the different properties were at all times in Pelbro's name (Defendants' Exh. 41).
Yellow Creek Coal Sales was established at the beginning of 1979 for a very legitimate purpose. During the preceding year, Pelbro encountered difficulties with the quality of its coal and complaints were received from the PP & L network (N.T. 1041, 1043-1044). In an attempt to solve the serious problems encountered by Pelbro with the then existing high sulphur content of its coal, Yellow Creek Coal Sales was formed, after review by and approval of management of PP & L network. Yellow Creek was engaged strictly in the business of the purchase and sale of coal. The UMWA was notified prior to the date that Pelbro ceased shipping coal directly to the PP & L network (Plaintiffs' Exh. 59, p. 88). The Pension Fund auditors further received notice of the action, and the letter included within their audit report.
As indicated, Yellow Creek Coal Sales performed an entirely different and viable function from that of Pelbro. From the beginning of 1979 forward, Pelbro was able to devote its attention to the mining and extraction of coal. PR & W, the management partnership of Robert Westrick, Nestor Peles and Nicholas Rend, provided purely management and consulting services to Pelbro and to Yellow Creek. As noted by Plaintiffs' witness (Vincent A. Razsa) at trial, it is not unusual, in fact a common practice, to find a group of business entities in the coal industry under common control, set up to perform different functions (N.T. 884, 926).[21]
Defendants submit that the evidence adduced at trial clearly supports the intentions that Pelbro was incorporated for a very legitimate purpose, long before the enactment of ERISA and long before Pelbro's financial problems resulting from the loss of his coal and the backfilling order imposed by the Department of Environmental Resources. The purpose of incorporation on September 19, 1973, was to provide continuity of life to the business entity to obtain tax benefits and to provide a shield against personal liability. The organization of a corporation for the avowed purpose of avoiding personal liability does not justify disregard of the corporate entity. Zubick v. Zubick, supra, 384 F.2d at 273.
Compare the scenario in Melikian v. Corradetti, 791 F.2d 274, 282 fn. 7 (3rd Cir. 1986) where the corporation was the "barest shell", without employees, inventory or office, nothing more than a "paper" sales subsidiary through which the parent corporation conducted its business.
6. Absence of Corporate Records. An additional factor recognized by all courts to be pertinent in an inquiry of this nature, is the absence of corporate records. Solomon v. Klein, supra, 770 F.2d at 354; United States v. Pisani, supra, 646 F.2d at 88-89; Zubick v. Zubick, supra, 384 F.2d at 271, 272 fn. 7; fn. 7; American Bell, Inc. v. Federation of Telephone Workers of Pennsylvania, supra, 736 F.2d at 886; DeWitt Truck Brokers v. W. Ray Flemming Fruit Company, supra, 540 F.2d at 687; Seymour v. Hull & Moreland Engineering, 605 F.2d at 1112.
Defendants submit that Pelbro maintained extensive corporate records, that records were continuously maintained through the course of Pelbro's operations over the years, and that the records highlight the existence of Pelbro as a separate *1566 business concern, distinct from its shareholders.
Articles of Incorporation were filed by Pelbro with the Department of State of the Commonwealth of Pennsylvania, and maintained by the corporation (Plaintiffs' Exh. 1). The corporation acquired a corporate minute book (Plaintiffs' Exh. 14) which was maintained by the corporation. Corporate minutes and resolutions were prepared with some degree of regularity (Plaintiffs' Exh. 2, 11). By-laws were adopted by the corporation (Defendants' Exh. 16) and maintained in the corporate minute book. Stock certificates were acquired by the corporation (Plaintiffs' Exh. 14) and issued to the shareholders. A stock transfer ledger (Plaintiffs' Exh. 13) was further acquired by the corporation, kept up-to-date and maintained ledgers and books of account and dutifully maintained its financial records.
Corporate transactions and meetings were reduced to minutes with some degree of regularity, and maintained in the corporate minute book (Plaintiffs' Exh. 2, 11). It should be noted that the courts have universally held that a substantial degree of informality is permissible in the context of the operation of a small, closely held corporation, and informality of little consequence. Zubick v. Zubick, supra, 384 F.2d at 271 fn. 4; Seymour v. Hull & Moreland Engineering, 605 F.2d at 1112, fn. 9. Cf., Wolfe v. United States, 798 F.2d 1241, 1244 (9th Cir.1986) where no records were maintained by the corporation, and Pisani, where the corporate records had been mysteriously lost shortly before trial.
Federal tax returns were timely and consistently filed by Pelbro throughout the course of its operation (Plaintiffs' Exh. 24, 29-41). State income tax returns and corporate stock returns were filed with like regularity (Defendants' Exh. 18-30). Employers quarterly federal tax returns (Defendants' Exh. 31) were also consistently filed by the corporation (N.T. 1081-1085). Financial statements were routinely prepared, including comprehensive depreciation schedules (Plaintiffs' Exh. 19).
Unemployment compensation reports and returns were consistently filed with both the federal and state government, as were workers compensation reports, federal coal excise tax returns and surface and reclamation returns.
Although, generally, most of the shareholder loans made to the corporation were not reflected by formal notes, all of the loans made to Pelbro by its shareholders were recorded in such form on deposit records prepared by Pelbro (Defendants' Exh. 44) and the transactions were recorded as such by Pelbro's accountant.
7. Insolvency of Debtor at the Time. Nearly all of the pertinent decisions that have promulgated factors in determining when it is justifiable to "pierce the corporate veil" have included that of the "insolvency of the debtor at the time". See Solomon v. Klein, supra, 770 F.2d at 354; United States v. Pisani, supra, 646 F.2d at 88: American Bell, Inc. v. Federation of Telephone Workers of Pennsylvania, supra, 736 F.2d at 886; DeWitt Truck Brokers v. W. Ray Flemming Fruit Company, supra, 540 F.2d at 686. These decisions do not, however, provide much insight as to the meaning of the wording "at the time" In Realco Serv. Inc. v. Holt, 513 F.Supp. 435 (E.D.Pa.1980), the district court added substance to the element by describing the factor as the insolvency of the debtor corporation "... at the time of contracting ..." 513 F.Supp. at 441. See also, TSS Sportswear Limited v. Swank Shop (Guam), Inc., 380 F.2d 512 (9th Cir. 1967).
Defendants are not sure as to the applicable date at which this Court should determine whether Pelbro was solvent or insolvent. On the one hand, a material date is the time at which Pelbro contracted with the UMWA, e.g., entered into the National Bituminous Coal Wage Agreement of 1978, as described in Paragraph 8 of Plaintiffs' Amended Complaint.[22] Arguably *1567 this date should apply in that the obligation of Pelbro to contribute to the Pension Fund rose out of this Agreement, and the termination of Pelbro's obligation to contribute to the Pension Fund, had its "roots" in this Agreement.
A review of Pelbro's balance sheet for its fiscal year ending August 31, 1978 (Plaintiffs' Exh. 29, Schedule L) reveals that Pelbro was extremely solvent at that time.
On the other hand, it appears that a much stronger argument can be made that the date at which the solvency or insolvency of Pelbro should be determined is the date of "withdrawal", e.g., the date[23] that Pelbro ceased to have any further obligation to contribute to the Pension Fund, 29 U.S.C. ง 1383(a), and the time at which, as Plaintiffs have alleged in Paragraphs 13 and 14 of their Amended Complaint:
As a result of its complete withdrawal from the Trusts, Pelbro ... incurred withdrawal liability ... under Section 4201 and 4202(1) ERISA, 29 USC 1381 and 1382(1).
A review of Pelbro's balance sheet at its fiscal year ending August 31, 1981 (Plaintiffs' Exh. 19) reveals that Pelbro was financially strong and extremely solvent at this time, notwithstanding the UMWA strike in March of 1981 that precipitated Pelbro's withdrawal from the Pension Fund.[24]
Perhaps the most reasonable approach, would be to view the corporation's financial picture during the terms of the two collective bargaining agreements between Pelbro and the UMWA, the termination of which led to the withdrawal liability.
To make the determination at any date beyond the date of Pelbro's withdrawal from the Pension Fund would, in effect, change the nature of the Plaintiffs' claim from an "alter ego" approach of "piercing the corporate veil" for the withdrawal liability obligations of the corporation, to that of a type of bankruptcy preferential avoidance action, a fraudulent conveyance theory or, an action under the Avoidance sections of ERISA. None of these claims have been pleaded, and they are not before the Court.
8. Commingling of Funds. An additional factor noted by many courts as relevant to an "alter ego" determination is whether there was substantial commingling of funds between the corporation and its "alter egos". Zubick v. Zubick, supra, 384 F.2d at 271 ("... no evidence that funds oscillated at will ..."); Seymour v. Hull and Moreland Engineering, supra, 605 F.2d at 1112 ("... no evidence of comingling of the personal funds of [the shareholders] with those of the corporation"); Maritime Ventures Int. v. Carribbean Trading & Fid., 689 F.Supp. 1340, 1353 (S.D.N.Y.1988) ("... the deposit of corporate money in a personal account indicates the same disregard for the corporate form as does commingling of funds"). See also, Wolfe v. United States, 798 F.2d 1241, 1244 (9th Cir.1986) and Mobler v. Braverman, 669 F.Supp. 592, 594 (S.D.N. Y.1987).
The reasoning behind the analysis in this context is simply that a commingling of corporate funds with the personal funds of the shareholders evidences a substantial disregard for the corporate form. No commingling of Pelbro's corporate funds was ever shown by plaintiffs. To the contrary, Pelbro, at all times maintained separate bank accounts (N.T. 1191-1192) maintained separate financial records, filed separate federal income tax returns (Plaintiffs' Exh. 24, 29-41), Pennsylvania income tax returns and capital stock tax returns (Defendants' Exh. 18-30), financial statements (Plaintiffs' Exh. 19), depreciation schedules (Plaintiffs' Exh. 3-5). Pelbro obtained and consistently used a federal tax identification number (N.T. 1081-1085, Defendants' Exh. 24, 29-41). Pelbro's records were kept separate and apart from any of the other business entities (N.T. 1073-1074). All employees were paid by Pelbro, from *1568 Pelbro funds. Pelbro routinely filed employers withholding returns (Defendants' Exh. 31).
All UMWA check-offs and contributions to the Pension Fund were made by Pelbro (N.T. 1122, Defendants' Exh. 38).
In short, there was never any commingling of funds between Pelbro and its shareholders.
9. Siphoning of Funds. The siphoning of funds of a corporation by its shareholders has been recognized as an additional factor in an analysis of whether the shareholders are the "alter ego" of the corporation, so as to justify a piercing of the corporate veil. Solomon v. Klein, supra 770 F.2d at 354; DeWitt Truck Brokers v. W. Ray Flemming Fruit Company, supra, 540 F.2d at 686.
In the case at hand, the Defendant shareholders had made substantial loans to Pelbro, most of which were made by the Defendant shareholders after the date (March 27, 1981) of "withdrawal" and "withdrawal liability", in an effort to maintain the survival of the corporation at the time that the deterioration of the coal seam was discovered and to cover backfilling expenses resulting from the Department of Environmental Resources order.[25]
In general, the shareholder loans to the corporation were not documented through formal Notes or security agreements.[26] All of the loans, however, were recognized as loans by both the corporation and its shareholders, and were contemporaneously recorded as "loans" on the bank deposits records of Pelbro (N.T. 1191-1192, Defendants' Exh. 44) at the time the loans were made. No interest was paid on the shareholder loans (N.T. 20-21). The shareholder loans were never fully repaid (N.T. 1302-1303).
Circumstances here are drastically different from those presented in United States v. Pisani, supra. There, Dr. Pisani's corporation always operated at a loss, was continuously undercapitalized, never paid dividends, kept no records or minute books, followed no corporate formalities and involved circumstances where Dr. Pisani continuously "... operated the corporation with his personal funds...." 646 F.2d at 85, 88.
Circumstances here are more like those presented in Carp. Hlth. & Welfare Fund of Philadelphia v. Ambrose, 727 F.2d 279 (3rd Cir.1983), an "alter ego" case under ERISA involving delinquent contributions to a union pension fund before the Third Circuit. There, the shareholders also loaned large sums to the corporation. However, as the Court noted:
"There is no evidence in the record to suggest that the Ambroses were taking money out of the corporation for their personal use; rather they acted more like good samaritans for the survival of the corporation". 727 F.2d at 284.
The repayment of legitimate loan obligations by a corporation, to its shareholders, does not, by itself, establish siphoning of funds. Mobler v. Braverman, supra 669 F.Supp. at 595. Shareholder loans to a closely held corporation are not improper. Zubick v. Zubick, supra, 384 F.2d at 271.
Nor can any inference be raised that the "management fees" paid by Pelbro to PR & W and Ren-Koe resulted in the siphoning of funds. The aggregate of the management fees paid by Pelbro to these partnerships, throughout the operating existence of the corporation, was $65,000 (N.T. 545-555, 558-559). Even assuming, arguendo, that the management fees of $528,702 paid by Yellow Creek Coal Sales to PR & W are relevant, it must be noted that the management fees were paid by Pelbro and Yellow Creek Coal Sales for *1569 services rendered.[27] In the context of the operating life of the corporation, the aggregate of all management fees during fiscal years 1977 through 1982 ($593,702) is far less than an amount that would be considered reasonable compensation in the coal industry to managers and superintendents, who generally receive compensation of $50,000 to $75,000 per year (N.T. 74-75).
Nor may the transfers of certain items of equipment by Pelbro to its shareholders be viewed as a siphoning of funds. Pelbro transferred a dragline and certain motor vehicles to shareholders[28] in 1983. The dragline, having a current market price between $350,000 and $400,000 (N.T. 378), was transferred to the shareholders and PR & W in consideration of loans previously made by these parties to Pelbro totalling $373,383.73 (N.T. 378). The transfer of the dragline resulted in a cancellation of indebtedness of Pelbro to these parties for the loans previously made (N.T. 1200-1202) and the Notes (Defendants' Exh. 45) previously issued by Pelbro on the loans. The corporate minutes (Plaintiffs' Exh. 11, p. 24), dated September 17, 1983, reflect the payment to be in cancellation of the indebtedness of Pelbro to these parties.
The motor vehicles transferred to Defendants had an aggregate "blue book" value of $30,000 (Plaintiffs' Exh. 12). Earlier corporate minutes dated July 18, 1983, indicate that the motor vehicles were transferred by Pelbro to the shareholders as partial payment against shareholder loans (N.T. 334-335, Plaintiffs' Exh. 11, p. 20). Later corporate minutes dated January 8, 1984, reflect that the motor vehicles were transferred by Pelbro to the shareholders as compensation for services rendered to the corporation (N.T. 558-593, Plaintiffs' Exh. 11, p. 35).
While these transfers may very well have been pertinent in a bankruptcy "preference" action, or the subject of a separate ERISA claim under the Avoidance statute, 29 U.S.C. ง 1392(c)[29] they occurred long after the withdrawal and the determination of Pelbro's withdrawal liability.
It is very questionable whether the transfers under any circumstances would be viewed as "siphoning", as the transfers were in consideration of preexisting indebtedness of Pelbro to its shareholders.
10. Fraudulent Intent in Formation. A fraudulent intent behind incorporation has been viewed as exceptionally pertinent. Zubick v. Zubick, supra 384 F.2d at 273; Seymour v. Hull & Moreland Engineering, supra, 605 F.2d at 1111; Laborers Clean-up Contract Administration Trust Fund v. Uriart Clean-up Service, Inc., supra, 736 F.2d at 524-525.
Policy reasons dictate that individuals incorporate in good faith, Seymour v. Hull Moreland, supra. The organization of a corporation as a shield against personal liability does not, however, justify disregard of the corporate entity. In fact, protection against personal liability is one of the recognized purposes behind the corporation. Zubick vs. Zubick, supra, at 384 F.2d 273. Indeed, many courts view fraudulent intent behind incorporation as a necessary element of an "alter ego". Operating Engineers Pension Trust v. Reed, 726 F.2d 513, 515 (9th Cir.1984); Seymour v. Hull & Moreland Engineering, supra, 605 *1570 F.2d at 1112-1113; Audit Services, Inc. v. Rolfson, 641 F.2d 757, 764 (9th Cir.1981)
Absolutely no evidence was produced by Plaintiffs that would raise even a hint of suspicion that there was any bad faith behind the initial corporation. Defendant Nestor Peles stated the reasons behind incorporation, being that of adding continuity of life to the family business, tax reasons (N.T. 84) and as a shield against personal liability (N.T. 984-991).
11. Recent Incorporation. Close proximity of initial incorporation to the date the liability is incurred, has been considered by many courts to be an indicia of a disregard of basic corporate principles requiring adequate capitalization, a sound business plan, a fraudulent intent behind incorporation and may lead to an inference that the corporation is a facade for the operations of its shareholders. As noted in Seymour v. Hull & Moreland Engineering, supra:
"The very fact of continuing to do business for a period of at least five years intends to indicate a good faith use of the corporation to conduct a legitimate business enterprise." 605 F.2d at 1113.
The Third Circuit has recognized the significance of a substantial hiatus between the date of incorporation and the date of liability. Zubick v. Zubick, supra, 384 F.2d at 274 fn. 16.
In the case at hand, Pelbro was incorporated on September 17, 1973. The "liability" in question, is the "withdrawal liability" of Pelbro to the Pension Fund, which arose on March 27, 1981, the date of the UMWA strike and the expiration of the National Bituminous Coal Wage Agreement of 1978. Pelbro was incorporated approximately 7ฝ years prior to the time that the withdrawal liability was triggered. Pelbro continued to enjoy a success in its business operations, financially and otherwise, through mid 1982, at which time the "fault" in the coal seam was discovered which, coupled with the backfilling order mandated by the Department of Environmental Resources, led to a quick demise of Pelbro's financial success.
The fact that Pelbro operated successfully for such a long period of time is a strong indication that it was a bona fide corporation, not a mere shell or instrumentality structured solely to work a fraud upon those dealing with the corporation.
12. Bad Financial Times. The insolvency of a corporation does not, by itself, lead to any inference that the corporation was a "sham". Pelbro's insolvency was clearly a result of the unexpected deterioration of its sole source of income, the coal seam at the Brush Valley job. This, coupled with the backfilling order issued by the Department of Environmental Resources, put Pelbro out of business. Without the loss of its coal resources, it is very possible that Pelbro would have remained a going concern. solvent to this day. No adverse inference can thus be drawn from Pelbro's financial condition at times subsequent to March 27, 1981, the date of "withdrawal liability". Substantial risks are inherent in most any business, and no adverse inference or fraudulent intent can be drawn "... simply on the basis of bad financial times". Seymour v. Hull & Moreland Engineering, supra, 605 F.2d at 1113.
13. Reliance. The extent of reliance of a creditor upon the creditworthiness of a corporation is important. Pelbro and the UMWA were parties to two collective bargaining agreements, the National Bituminous Coal Wage Agreement of 1974 and the National Bituminous Coal Wage Agreement of 1978 (Defendants' Exh. 35-36). Under Article XX(h)(1) of the 1974 contracts, and Article XX(g)(1) of the 1978 contract, the Pension Fund was free to audit and examine the books and records of Pelbro at any time. In fact, the Pension Fund auditors did indeed audit Pelbro's records. A rather extensive audit report (Plaintiffs' Exh. 59) was compiled at the time. Indeed, at one point during the course of the audit, the audit supervisor suggested to the Pension Fund that it follow up on the "relationship between Pelbro and Yellow Creek Coal Sales (Plaintiffs' Exh. 59, p. 41). Furthermore, the December 28, 1978 letter from Pelbro to the UMWA was also received by the Pension Fund (Plaintiffs' Exh. 59, p. 88).
*1571 In short, there has never been any misrepresentation or fraud shown, such as in DeWitt Truck Brokers v. W. Ray Flemming Fruit Company, supra 540 F.2d at 689; United States v. Pisani, supra, 646 F.2d at 88, fn. 5. See also Seymour v. Hull & Moreland Engineering, supra.

FAILURE TO PROVIDE FOR STATUTORY NOTICE AND ASSESSMENT
Defendants previously filed a Motion to Dismiss Count III of the Amended Complaint as a result of the failure of Plaintiffs to comply with the statutory requirement of written notice of the assessment of withdrawal liability upon the individual Defendants. The Motion was dismissed by the Court, without prejudice, for subsequent determination after greater factual development at trial. The failure to provide the statutory notice was raised as an affirmative defense by the Defendants in their Answer (Seventeenth Defense). Defendants submit that judgment should be entered in their favor as a result of the failure of Plaintiffs to comply with the mandatory notice provisions of ERISA and MMPPA.
This Court has heretofore determined that the individual Defendants are not "Employers", as such term is defined under ERISA, as Plaintiffs had advanced under Count I, and that Plaintiffs state law theory of recovery advanced under Count II is equally inapplicable. Counts I and II have been dismissed.
It is thus clear that Plaintiffs must make a showing as to the individual liability of the Defendants for withdrawal liability, under a theory other than that of their relationship to the Corporation (Pelbro) as officers, directors or dominant shareholders, i.e., Plaintiffs' allegations in Counts I and II that the individual defendants had significant ownership interest and control over the operation of Pelbro, were personally involved in matters pertaining to Plaintiffs and the decision to withdraw, that they acted directly or indirectly in the interest of Pelbro in relation to Plaintiffs (as advanced under Counts I and II) are insufficient.
Plaintiffs say that, as the individual Defendants are the "alter ego" of corporation, notice to the Corporation serves as notice to all of them. This argument is not consistent with the notice directives of ERISA and MMPPA, and is discussed more fully below. Furthermore, Plaintiffs' attempt to suggest to the Court that they gave written notice to the individual Defendants is at best misplaced, as an examination of the written notices will show.

ANALYSIS OF THE NOTICES
As we have seen, Plaintiffs mailed two (2) separate written notices to the Corporation, dated September 1, 1982 (Defendants' Exh. 9). Plaintiffs have stated in Paragraph 15 of the Amended Complaint that the notices were sent to the Corporation and the individual defendants. A cursory examination of the documents reveal that this is not the case.
The letters are addressed to the Corporation, to the attention of Nestor Peles as President or chief executive officer of the Corporation. No mention is made as to Nestor Peles, as an individual. Nor is any mention made of any of the other individual Defendants, or any other person.
The letters open with the comment "This in regard to the withdrawal of Pelbro Fuel, Inc....". No mention is made as to any "withdrawal" by the individual Defendants, or liability on the part of the individual Defendants.
The letters inform the Corporation that, under ERISA and MMPPA, an "employer" that withdraws from a multiemployer pension plan, is liable for withdrawal liability. Plaintiffs do not inform the Corporation that any other person or individual may also be liable, and this Court heretofore determined, at the time Counts I and II of the original complaint were dismissed, that the individual Defendants are not "employers" under ERISA or MMPPA.
The Plaintiffs go a step further in their letters. They state that they "... have determined that ... Pelbro Fuel, Inc. withdrew *1572 from the ..." pension plan. The letter then states that Pelbro Fuel, Inc. is liable to Plaintiffs for a specified amount of withdrawal liability, and informs the corporation that the letter is to be construed as a formal Notice and Demand for payment of withdrawal liability. The letter then informs the Corporation of the rights to which it is entitled under ERISA, such as the right to request a review of the Plaintiffs' decision, the right to review the withdrawal liability calculations, and the right to request arbitration. The letter thereafter informs the Corporation that a failure by the Corporation to exercise these rights within a timely fashion will result in a waiver by the Corporation that a failure by the Corporation to exercise these rights within a timely fashion will result in a waiver by the Corporation of any defense or objections to the Plaintiffs' determination of withdrawal liability, will result in the imposition of interest on delinquent payments and will give rise to a default which will permit the Plaintiffs to demand and collect the entire amount of withdrawal liability from the Corporation in a lumpsum payment, together with interest, legal fees, liquidated damages and interest.
By letters dated February 28, 1983 (Plaintiffs' Exh. 9) Plaintiffs mailed the "demand" and "default" notices. Plaintiffs would have us believe (Paragraph 17 of the Amended Complaint) that these notices were sent to the individual Defendants, as well as to the Corporation. As with the earlier letters, this is not the case.
The letters were also addressed to the Corporation Pelbro Fuel, Inc., to the attention of Nestor Peles, as President and Chief executive officer of the Corporation. The letters again, inform the Corporation that the purpose of the notice "... is in regard to the withdrawal of Pelbro Fuel, Inc. from the ..." (emphasis supplied) pension plans. The letters informed the Corporation that Pelbro Fuel, Inc. was notified by the earlier letters (Sept. 1, 1982) that it was required to discharge its withdrawal liability through payments to the Plaintiffs. The letters further state that, pursuant to ERISA and pursuant to the "Plan" the Plaintiffs were providing "Notice" that if Pelbro Fuel, Inc. did not pay certain monies to Plaintiffs by a certain date, that Pelbro Fuel, Inc. would be in default and the entire amount of withdrawal liability would fall due.
No mention is made as to Nestor Peles, as an individual nor is any mention made of any other individual or person. The Plaintiffs set forth in the letters that they were providing notice pursuant to "ERISA" and their "Plan". As we have seen, the individual Defendants are not employers under ERISA, and the Plaintiffs have admitted in their pleadings that the individual Defendants are not signatory to the Wage Agreements and the Pension "Plan" of the Plaintiffs

LACK OF NOTICE AND DEMAND COMPLIANCE
The Plaintiffs quite simply have failed to satisfy the notice and demand requirements of ERISA and MMPPA. The entire scope of withdrawal is embraced by the MMPPA amendments to ERISA. 29 U.S.C. ง 1401 governs resolution of disputes and provides for arbitration proceedings under ERISA and the MMPPA amendments. Further provisions of ERISA relate to judicial proceedings. Whether the claims of a pension plan for withdrawal liability be asserted in arbitration, or through litigation, a determination of withdrawal liability must first be made under 29 U.S.C. งง 1381 through 1399 as required by 29 U.S.C. ง 1401(1).
As noted in Connors v. Darryll Waggle Construction, Inc., 631 F.Supp. 1188 (D.C.D.C.1986), the notice requirements are mandatory.
"Upon examination of ERISA'S procedural scheme, it is clear that an action for withdrawal liability under Section 1401(b) is commenced by a statutory notice and demand for payment as required by Section 1399(b)(1). 631 F.Supp. at 1190."
Once a determination of withdrawal liability is made, the plan is required to notify the employer in writing of the liability, 29 U.S.C. ง 1399(b)(1), and make written demand *1573 for payment, 29 U.S.C. ง 1399(b)(1)(B).
These latter events trigger certain rights accorded an employer. For instance, the employer may, within ninety (90) days of the aforesaid written notices, ask for a review by the trustees of the plan. 29 U.S.C. ง 1399(b)(2)(A). The employer is entitled to a "reasonable" review. 29 U.S.C. ง 1399(b)(2)(B). If the dispute continues, the employer may demand arbitration. 29 U.S.C. ง 1401(a)(3)(A). The employer may further seek review of an arbitrator's decision in a district court. 29 U.S.C. ง 1401(c).
The Plaintiffs have never sent these written notices to Defendants, despite the allegations they have made in the Amended Complaint. The failure to so notify Defendants is fatal to Plaintiffs' claim.
In Debreceni v. George Lamoureux & Co., 629 F.Supp. 598 (D.Mass.1986), the court held that:
"The Court rules that the Defendant correctly contends that the notice requirement set forth in 29 U.S.C. 1399(b)(1) is a precondition to a suit in federal court to collect withdrawal liability". 629 F.Supp. at 601.
See also Combs v. Sun-Up Coal Company, Inc., 634 F.Supp. 13 (D.C.D.C.1985), an action brought by these same Plaintiffs against the officers and shareholders of a corporation, where the court held:
"The Court also notes that these defendants were not given any notice or any opportunity to individually appeal and arbitrate the assessment required by ... ERISA, 29 U.S.C. 1399 and 1401. Accordingly, Plaintiffs' complaint against them could also be dismissed on this basis." 634 F.Supp. at 19.
As is evident, the individual defendants were never given notice that any withdrawal liability had been or might be assessed against them, nor were they advised of their rights under 29 U.S.C. ง 1399(b)(2)(A) or any of the other ERISA/MMPPA provisions, or their right to initiate arbitration. The notice and demand letters referred to in Paragraph 15 and 17 of the Amended Complaint are addressed to Pelbro Fuel, Inc. They are solely "in regard to the withdrawal of Pelbro Fuel, Inc." from the Plans. Nowhere is there any hint or suggestion that withdrawal liability is being assessed against anyone other than Pelbro Fuel, Inc., that anyone other than Pelbro Fuel, Inc. has any rights that may be exercised, or that anyone other than Pelbro Fuel, Inc. may be waiving rights if they do not act.
Absent any notice by the Plaintiffs that they were also seeking withdrawal liability payments from the individual defendants and that the individual defendants, too, had "important procedural and substantive rights under ERISA and MMPPA" which would be waived by not exercising them, the individual defendants may not be assessed any withdrawal liability.

IMPUTED NOTICE TO SHAREHOLDERS
As we have seen, the pronouncements of the Third Circuit foreclose personal liability of individuals by virtue of their position as officers and directors of an "employer" corporation. The Third Circuit has further ruled that ERISA preempts any attempt on the part of a state to impose similar liability on the officers and directors of a corporation. McMahon v. McDowell, 794 F.2d 100 (3rd Cir.1986). Plaintiffs seek to circumvent these pronouncements, on the theory that they, in reality, dealt with the individuals and not the Corporation. If so, they are required under ERISA to send notice to these individuals. The mere fact that written notices were sent to the Corporation, to the attention of its president, is simply insufficient as notice to the individuals. And as previously noted, the notices specify the liability of the Corporation and not the individuals.
The district court in Combs v. Sun-Up Coal Company, Inc., supra, dealt with the issue of whether written notice to the individual shareholders of a corporation was required in a setting involving a claim that they acted as the "alter ego" of the corporation. Following an elaborate discussion of the circumstances under which individual shareholders, officers and directors may *1574 be held liable as the "alter ego" of the corporation, the court there held:
"There is nothing in the record to suggest that they were the alter ego of the corporation, or were otherwise personally responsible for the corporation's withdrawal from the Plans. The Court also notes that these defendants were not given any notice or any opportunity to individually appeal and arbitrate the assessment as required under sections 4219 and 4221 of ERISA, 29 U.S.C. 1399 and 1401." 634 F.Supp. at 19.
The District Court in Sun-Up thus squarely met the issue that is before this Court, by holding that even in the context of a claim that individual shareholders, officers and directors are liable as the alter ego of a corporation, that they are entitled to separate written notice.
The prejudice is glaring when we note that Plaintiffs further seek to impose the mandatory twenty (20) percent liquidated damages penalty upon the individual defendants, simply because of their failure to respond to the notices. Plaintiffs further seek to impose, upon the individual defendants, mandatory attorneys' fees and interest simply because of the failure of the individual defendants to respond to the notice. Plaintiffs would further deny the individual defendants, if indeed they were obligated to pay withdrawal liability, the right to pay in installments. There is not a hint in any of the notices that the plaintiffs sought withdrawal liability against the individuals.
Nor may the Plaintiffs assert lack of knowledge as to the individuals involved. The Plaintiffs prosecuted an entire lawsuit against the corporation in the United States District Court for the District of Columbia, a lawsuit that spanned approximately two years, involved discovery and numerous court appearances. Additionally, Plaintiffs have failed to exercise their rights and duties under 29 U.S.C. ง 1399, through their failure to make an early determination of who they viewed as the "employer" or "employers", or to make a timely request for the information they deemed necessary to make an informed determination.

FULL FUNDING OF THE 1950 PLAN
The withdrawal liability incurred by Pelbro on March 27, 1981, was computed, in very large part,[30] by virtue of the unfunded liability of the 1950 pension plan at that time. In their determination of the "withdrawal liability" of Pelbro, the Plaintiffs looked to the "date of withdrawal", or March 27, 1981, to determine (1) the total amount of the unfunded vested benefits of the entire 1950 Pension Trust, at the end of the plan year in which the withdrawal occurred, 29 U.S.C. ง 1391, and (2) the prorata portion of the unfunded obligation to be imposed upon Pelbro as of that time.
While the 1950 Pension Trust was then unfunded, the pension plan is now completely funded. A Stipulation filed with this Court by Plaintiffs and Defendants reveals that the pension plan was fully funded as of June 30, 1988.
As we have seen, the Plaintiffs failed to issue the statutory assessment notice required under ERISA to the Defendants, as individuals. Receipt of the notice triggers certain rights under ERISA, as previously discussed, including the right to pay the "employers" pro-rata share of the unfunded liability of the pension plan in installments over a period of time, the right to a review of the pension fund's financial accounting of their liability, the right to arbitration, etc. Were the Plaintiffs to issue the statutory notices at this time, no unfunded vested liability of the 1950 Pension Trust exists, and no withdrawal liability would be imposed with respect thereto.
On the other hand, Plaintiffs argue that the obligation of the "employer" for the unfunded vested liability of a pension plan must be determined as of the date of withdrawal, e.g., in this instance March 27, 1981. If this is the case, it is crystal clear that Defendants were not the "alter ego" *1575 of Pelbro at that time and, likewise, not liable for the withdrawal liability of Pelbro that Plaintiffs would impose as of that date.

NEW CAUSES OF ACTION AND LEGAL THEORIES
Plaintiffs have again lashed out with a host of additional claims and new legal theories, independent from the alter ego cause of action advanced in their Amended Complaint.
A review of Plaintiffs' Brief and their proposed Findings of Fact and Conclusions of Law, invites this court to entertain additional grounds for relief, touching upon not less than seven (7) theories or causes of action not pleaded. Plaintiff has advanced theories under the Bankruptcy Code (Defendants' Brief, p. 22-23), the Pennsylvania Business Corporation Act (Defendants' Brief p. 22), the Pennsylvania Uniform Fraudulent Conveyance Act (Plaintiffs' Brief, p. 23), preferential payments, (Plaintiffs' Brief, p. 24), fraud (Plaintiffs' Brief pp. 22, 25), defacto liquidation (Plaintiffs' Proposed Conclusions of Law No. 13), and the "single employer" or single enterprise doctrine (Plaintiffs' Brief pp. 15-19).
During trial, the court invited counsels' attention (NT 181) to a recent decision of the Supreme Court of the United States in Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987), which, coupled with two earlier decisions of the Supreme Court in Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1983) and Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983), clearly established that the comprehensive nature of ERISA regulation and the need for a uniform system of enforcement of ERISA, has resulted in a wholesale preemption of such claims as those that Plaintiffs' believe arise under the Pennsylvania Business Corporation Law, fraud on creditors, violations of the Pennsylvania Uniform Fraudulent Conveyance Act, preferential payments and de facto liquidations.
In this instance, it is not worth the time to discuss that these claims have not been pleaded. The simple fact is, they are barred under the preemption doctrines enunciated by the foregoing decisions of the Supreme Court.
With respect to Plaintiffs' claims that Defendants have violated certain procedures that should have been followed under the Bankruptcy Code, it is again not worth the time to argue that this claim is outside the scope of the pleadings. We are not in a bankruptcy setting and this is not Bankruptcy Court.
Plaintiffs have, however, devoted substantial attention in their Brief, to the "single employer" doctrine, what Plaintiffs have cavalierly styled the "single enterprise" doctrine. The doctrine is known as the "single employer" doctrine, NLRB v. Al Bryant, Inc., 711 F.2d 543 (3rd Cir. 1983), and for a very good reason.
As the Third Circuit has noted, the "single employer" concept recognizes that the business entities are in fact separate. NLRB v. Browning Ferris Industries, 691 F.2d 1117, 1123 (3rd Cir.1982).
The "single employer" doctrine is a theory unique to labor law. Carpenters Local Union No. 1846 v. Pratt-Farnsworth, 690 F.2d 489, 504 (5th Cir.1982), NLRB v. Browning-Ferris, supra. The focus of the "single employer" doctrine is whether two or more groups of employees, employed by separate and independent employers, should constitute a single bargaining unit, because of the ability of each of the employers to exercise sufficient control over the work of all employees. Boire v. Greyhound Corporation, 376 U.S. 473, 84 S.Ct. 894, 899, 11 L.Ed.2d 849 (1964).
The "single employer" doctrine advanced by plaintiffs, and discussed in the decisions in plaintiff's brief, at pp. 15-19, is quite simply a creature of labor and the NLRB and has no application in an ERISA setting.
That the "single employer" is distinct from an "alter ego" claim, is recognized by the very decisions cited by plaintiffs, two of which involve pronouncements out of the Third Circuit. In NLRB v. Al Bryant, Inc., 711 F.2d 543 (3rd Cir.1983), a "single employer" claim was raised in the context *1576 of a collective bargaining unit determination. The suit further involved a separate "alter ego" claim. The Third Circuit noted that "The focus of the alter ego doctrine [is] unlike that of the single employer doctrine. ...." 711 F.2d at 553. In American Bell, Inc. v. Federation of Telephone Workers of Pennsylvania, 736 F.2d 879 (3rd Cir.1984), three separate causes of action were involved, one of which was clearly a "single employer" claim raised in the context of labor relations between the employer and its employees, 736 F.2d at 888-889, and another of which was clearly an "alter ego" claim. 736 F.2d at 889. In Carpenters Local U NO. 1846 v. Pratt-Farnsworth, 690 F.2d 489 (5th Cir.1982), the appeals court noted that the doctrines of "single employer" and "alter ego" are conceptually distinct. 690 F.2d at 508. The court there noted that the "Plaintiff's pleadings allege (in addition to ... centralized control of labor relations ...) that of the alter ego employer". 690 F.2d at 507. Similarly, in Plumbers Local U. No. 519 Miami Florida v. Service Plbg. Co., Inc., 401 F.Supp. 1008 (S.D.Fla.1975) a "single employer" labor law claim was presented as an alternative count to an "alter ego" claim. 401 F.Supp. 1010.
The doctrines are quite distinct, and require totally different analyses. As noted in the leading Third Circuit decision outlining the applicable alter ego criteria, Solomon v. Klein, supra, and by plaintiffs themselves on p. 13 of their brief.
"[H]ad [the Retirement Fund] proceeded on an alter ego basis our inquiry would be different", 770 F2d at 353.
Defendants contend that the inquiry should here be confined to an alter ego determination, for that is what Plaintiffs have pleaded. In fact, Plaintiffs earlier admitted in Paragraph 3 of Motion to Amend Pleadings to Conform To the Evidence, submitted during the trial of this case and rejected by the Court, that the legal doctrine upon which their case is founded is the "alter ego" doctrine.
Plaintiffs' Brief next takes an unusual twist, where it states that the "single employer" doctrine, discussed in the context of NLRB proceedings, is applicable to an ERISA claim for withdrawal. See Plaintiffs' Brief at p. 18, citing Central States, etc. Pension Funds v. Long, 687 F.Supp. 298 (E.D.Mich., 1987). This is a gross distortion of the facts and the law! The Central States decision does not involve the labor law "single employer" doctrine. Plaintiffs' attempt at an "end run" around their pleading deficiencies presents the best opportunity to discuss the precise nature of the claims set forth in their Amended Complaint, and the precise nature of a claim not pleaded, that could have been pleaded by Plaintiffs against Pelbro in district court in the District of Columbia, and that Plaintiffs are now barred from asserting.
Plaintiffs have consistently advanced their argument in two separate briefs filed during pre-trial motions, on two separate occasions during pre-trial Argument, and have again presented the theory on pp. 28-34 of their Brief, that the "alter ego doctrine" rests on the idea that, where a corporation has no separate existence, that "notice" and "demand" upon Defendants is unnecessary, because the Defendants and the corporation are one and the same.
Plaintiffs obtained judgment against Pelbro, the corporation, in district court in the District of Columbia. They now seek to enforce the judgment against Defendants, claiming that, as Defendants are the "alter ego" of the corporation being one and the same, that they (Defendants) are liable for the judgment. This is clearly the only claim advanced by Plaintiffs in Count III of their Amended Complaint. No other interpretation is possible.
The civil action commenced by Plaintiffs against Pelbro in the District of Columbia was clearly an action brought under ERISA upon a claim for withdrawal liability (Defendants' Exh. 49, the "Complaint" of Plaintiff filed at Civil Action No. 83-1524, in the United States Court for the District of Columbia). In that action, Plaintiffs asserted a single claim or cause of action against a corporation, "Pelbro Fuel, Inc." The Federal Rules of Civil Procedure and federal law are no less applicable *1577 to the Plaintiffs in the District of Columbia than they are in the Western District of Pennsylvania. In the District of Columbia action, Plaintiffs were required to advance all claims against the "employer" liable for withdrawal liability, arising out of the "same transaction", in this case Pelbro's "withdrawal" from any obligation to contribute to the Pension Fund following the expiration of the 1981 UMWA strike.
Because Plaintiffs' claim for "withdrawal liability" arose under ERISA, Plaintiffs were required to proceed to enforce whatever rights they believe they had under the comprehensive ERISA statutes. As the Supreme Court noted in Pilot Life Ins. Co. v. Dedeaux, supra, the detailed provisions or ERISA:
"... set forth a comprehensive civil enforcement scheme that represents a careful balancing of the need for prompt and fair claim settlement procedures. ...."
"The deliberate care with which ERISA's civil enforcement remedies were drafted and the balancing of policy embodied in its choice of remedies argue strongly for the conclusion of ERISA's civil enforcement remedies were intended to be exclusive" 107 St.Ct. at XXXX-XXXX.
The Central States, Etc. Areas Pension Fund v. Long decision was cited by Plaintiffs out of context. In Central States, the Pension Fund filed an ERISA action asserting that two separate employers should be deemed a "single employer" within the controlled group statutes of ERISA, 29 U.S.C. งง 1002(37)(B) and 1301(b)(1). The ERISA "common control" statutes, discussed by Defendants in their Memorandum at pp. 83-85, is a separate legal claim or cause of action under ERISA whereby two or more businesses under common control may be liable for withdrawal liability. The cause of action is entirely a creature of ERISA. That it is distinct from an "alter ego" claim requires no decision.

THE "CONTROLLED GROUP" ARGUMENT
Plaintiffs made passing reference in an earlier brief to circumstances involving "notice" to members of a "controlled group". The argument is entirely inapplicable and merely circumvents the issues before the court. Under ERISA, settings exist from time to time involving closely related members of "trades or businesses", referred to as "controlled groups". Under certain circumstances, one member of a controlled group may be responsible for the withdrawal liability of another member of the controlled group. These principles apply only when there are two or more separate businesses that are banded or associated together in a "controlled group". Participation in the controlled group, by itself, imposes equal responsibility upon all members of the controlled group for the withdrawal liability of an "employer" member of the controlled group, i.e., even though the "employer" member of a group of trades or businesses is the only one with a pension plan. Once notice to the "employer" is given, as required by 29 U.S.C. ง 1399, it is totally irrelevant as to whether actual or even constructive notice is given or imputed to the "non-employer" members of a controlled group. The liability of the "non-employer" members of a controlled group does not rest on any notice safeguards under ERISA. The "non-employer" members of the controlled group do not even have to be engaged in the same business enterprise, or even in a similar business. A striking example is provided in Pension Benefit Guaranty Corp. v. Ouimet Corp., 630 F.2d 4, 11-13 (1st Cir.1980), where one member of a controlled group (the "non-employer") did not even have any employees!
Congress built the equivalent of withdrawal liability "guaranty's" into ERISA, at the time of the enactment of the multiemployer amendments. The "guaranty's", commonly known and referred to as the "controlled group" statutes, 29 U.S.C. ง 1301(b)(1), and the regulations adopted thereunder, 29 C.F.R. Part 2612, and consider the entire group as but one "employer", 29 U.S.C. ง 1002(5), and impose absolute liability upon all members of a control group for the withdrawal liability of any member of a statutory group of enterprises, *1578 even though the "employer" member of a group of trades or business is the only one with a pension plan, and regardless of whether their groups have employees. Pension Benefit Guaranty Corp. v. Ouimet Corporation, 630 F.2d 4 (1st Cir.1980). Under "controlled group" statutory liability, an inquiry as to the interrelationship of the members of the control group, with the employees of all members of the control group, as required under the "single employer" test, is totally unnecessary and irrelevant.
In short, the statutory criteria under a "controlled group" claim, for determining when a partnership and its partners, and when a sole proprietor, are liable for the withdrawal liability of a corporation, provide that (1) where the partners of a partnership, individually or collectively, own in excess of 50% of the stock of the signatory corporation, the partnership is liable, (2) where the partners of the partnership, in turn, through certain statutory "attribution" rules, 29 C.F.R. Part 2612, are individually or collectively deemed to own in excess of 50% of the partnership, each of the partners is liable for the withdrawal liability of the partnership, and (3) where a sole proprietor, individually, or as a result of certain "attribution" rules, is deemed to own in excess of 50% of the stock of the corporation, the sole proprietor is liable for the withdrawal liability of the corporation.
That the plaintiffs have failed to plead a claim or cause of action under the statutory "controlled group" cause of action is readily apparent from the pleadings. A review of the Amended Complaint quickly reveals the total absence of any assertion that the partnership, PR & W or Ren-Koe, or the sole proprietorship, Yellow Creek Coal Sales, are members of a "controlled group" with Pelbro, under the ERISA criteria. There is no mention of PR & W, Ren-Koe and Yellow Creek Coal Sales in the Amended Complaint. The very first time this argument has been advanced by Plaintiffs was in their briefs now before this Court.
Liability under the "controlled group" statutes is an independent cause of action. Plaintiffs themselves recognize this. By way of illustration, Defendants have attached to their Reply Memorandum in an Appendix, a Complaint filed by these very plaintiffs in the United States District Court for the District of Columbia, in a totally unrelated action, wherein the Plaintiffs alleged that an individual, engaged in a trade or business as a sole proprietor (Paragraph 6), owned all of the stock of a corporation (Paragraph 7), and affirmatively pleaded that the corporation and the individual were members of a group of trades or businesses under common control within the meaning of 29 U.S.C. ง 1301(b)(1), and thus deemed to be but one "employer" (Paragraphs 8 and 15).
Plaintiffs have attempted to "weave" the controlled group theory into a separate and independent standard for determination of whether Defendants are the "alter egos" of Pelbro. In this respect, plaintiffs now ask this Court to abandon the standards promulgated by the Third Circuit in Solomon v. Klein, supra, and to formulate a different standard.
A host of additional reasons, beyond those discussed above, require that plaintiffs theories be dismissed out of hand. Plaintiffs would ask this Court to impose liability upon the partnership (PR & W and Ren-Koe) and upon the sole proprietorship (Yellow Creek Coal Sales). It is manifestly clear that PR & W, Ren-Koe and Yellow Creek Coal Sales are not parties to this action. One of the partners of PR & W, Robert Westrick, has never been named as a party defendant in this case. It is further clear that Stephen Peles, in his capacity as the sole proprietor of Yellow Creek Coal Sales, has never been named as a party defendant to this action. PR & W, Robert Westrick, Ren-Koe and Yellow Creek Coal Sales, or Stephen Peles in his capacity as a sole proprietor of Yellow Creek Coal Sales, would be indispensable parties to any such adjudication.
As noted in Defendants' Memorandum, Plaintiffs' cause of action accrued on March 27, 1981, the date at which Pelbro no longer became obligated to contribute to the Pension Fund. Plaintiffs' claims *1579 against PR & W, Robert Westrick, Ren-Koe and Yellow Creek Coal Sales, and Stephen Peles, in his capacity as the sole proprietor of Yellow Creek Coal Sales, are barred by the six year statute of limitations set forth in ERISA, 29 U.S.C. ง 1451(f)(1). Defendants have advanced the affirmative defense of the bar of the statute of limitation in their Answer, more particularly in their Third Defense.
Plaintiffs are further barred by estoppel and claim preclusion from asserting these arguments, an affirmative defense advanced by Defendants as the Sixteenth Defense in their Answer. The "controlled group" cause of action, was readily available to Plaintiffs in the lawsuit commenced by Plaintiffs in district court in the District of Columbia. Under the controlled group statutes, all groups of trades or business under common control are indeed deemed to be a "single employer", for purposes of withdrawal liability, and equally liable for the withdrawal liability of the signatory party. 29 U.S.C. ง 1301(b)(1). A necessary determination by the district court at the time that Plaintiffs obtained a judgment against Pelbro, was the identification of the "employer".
Jurisdiction was present in the District of Columbia and the Plaintiffs, if ever they sought liability against these business entities or their principals, were required to assert their claims in one single legal proceeding. However, the Plaintiffs chose to file a complaint (Defendants' Exh. 49) in the District of Columbia, proceeding against Pelbro as the only "employer against whom they sought liability."

SUMMARY
A fair review of the evidence reveals that Pelbro was a distinct and independent business corporation, not a "sham", a "dummy" or a "paper corporation". Pelbro was a very viable business organization, the owner of substantial assets, engaged in substantial productive operations, the employer of a small to medium sized work force, known to all concerned as a separate business entity. It was not a fictional device, as illustrated in the many cases discussed herein, designed at the whim of its shareholders. Pelbro's operations were immensely successful from the start and continued as such until hampered by the 1981 UMWA strike and the backfilling order, and dealt a death blow by the loss of its coal reserves from the unexpected, catastrophic geologic fault encountered in its coal seam. Circumstances leading to Pelbro's "withdrawal" and the monumental claim of "withdrawal liability" resulted, not from any scheme on the part of management to avoid a just debt, but from business misfortunes. Pelbro did not "fire its workers, in fact all but two of its employees returned to work with Pelbro following the protracted strike during 1981. The employees returned as non-union workers, resulting in a statutory withdrawal under the oft criticized multiemployer pension amendments under ERISA. At no time did Pelbro engage in a wholesale scheme to avoid its just debts or to defraud its creditors.
Judgment will be entered for the Defendants. An appropriate Order will be entered of record.

ORDER
AND NOW, this 2nd day of November, 1989, it appearing that the findings of fact, the conclusions of law, and this Court's Opinion heretofore filed in this case requires this Court to enter Judgment in favor of the Defendants,
NOW THEREFORE, IT IS THE ORDER OF THIS COURT that judgment be entered in favor of the Defendants and against the Plaintiffs. Plaintiffs shall pay all proper costs.
Defendants are granted leave to apply for reasonable attorney fees.
NOTES
[1] In their Amended Complaint, the plaintiffs restated original Counts I and II despite the fact that these counts were dismissed by the Order Of Court of April 8, 1987.
[2] Linda Kohut, one of the Defendants herein, the daughter of Defendant, Nestor Peles, was previously married to Robert Westrick. Linda Kohut and Westrick divorced in 1982 (N.T. 373-374, 434). Westrick's interest in Pelbro was acquired by Linda Kohut following the divorce. Although an officer, (Plaintiffs' Exh. 11, p. 7; N.T. 415-416) and shareholder of Pelbro at the time that Pelbro incurred a "withdrawal" on March 27, 1981, Westrick was not named as a Defendant in this lawsuit. When asked to explain the rationale at trial, Plaintiffs advised the Court that Westrick was not named as a Defendant because he was not a principal of Pelbro "... at the time of withdrawal" (N.T. 863). This is not the case. Pelbro's withdrawal occurred on March 27, 1981. Westrick was a shareholder and officer of Pelbro at that time.
[3] All of the income shown on Pelbro's tax returns for its three fiscal years ending 8/31/74, 8/31/75 and 8/31/76 (Plaintiffs' Exh. 30-32) was derived from the "Penn Run" job, as Pelbro did not extract coal from the "Brush Valley" job, until August of 1976 (N.T. 1027) and was not paid for its coal until the month following delivery.
[4] All of the income shown on Pelbro's tax returns for its five fiscal years ending 8/31/81 was derived from the "Brush Valley" job, as Pelbro removed the last cut of coal from its "Penn Run" job during the summer of 1976 (N.T. 1027). Pelbro's gross revenues from the Brush Valley job during these five fiscal years, was $948,781.88, $1,506,566.85, $2,061,184.38, $1,159,502.83 and $2,834,407.52.
[5] Yellow Creek Coal Sales was formed as a separate company and a sole proprietorship of Stephen Peles. His father, Nestor Peles, explained that Steve was "coming of age", about to enter business and that he would be able to devote considerable attention to the purchase, sale and marketing of coal (N.T. 369-370). Robert Westrick also indicated that Stephen Peles was the "sole" owner of Yellow Creek Coal Sales (N.T. 420).
[6] Pelbro had retained earnings of $222,864.60 at the conclusion of its fiscal year ending 8/31/82 (Plaintiffs' Exh. 42).
[7] A "withdrawal" as that term is defined under ERISA and MPPAA occurs when an employer ceases to have any obligation to "contribute" to a Pension Plan. In this instance, when the 1978 Bituminous Coal Wage Agreement expired and Pelbro's employees dropped out of the Union, Pelbro, as an "employer" no longer had any obligation to contribute to the Pension Plan.
[8] Following the "withdrawal" of an employer under a Pension Plan, an "assessment" is required to be made by the trustees of the pension plan against the employer for the dollar amount of the withdrawal liability, computed in accordance with criteria set forth ERISA and MPPAA.
[9] "Contributions", in the context of the National Bituminous Coal Wage Agreements, are certain amounts that each signatory employer is required to pay (in this case, monthly) to the Pension Plans based upon computations on gross coal production and on hours of work.
[10] Article XX(d)(1) of the 1974 National Bituminous Coal Wage Agreement (Defendant's Exhibit 35) states that each "Employer engaged in the production of coal shall contribute to the Trusts...." An identical provision is found in Article XX(d)(1) of the National Bituminous Coal Wage Agreement of 1978 (Defendants' Exh. 36).
[11] A Stipulation filed with the Court by Plaintiffs and Defendants, reveals that the 1950 Pension Plans were fully funded as of June 30, 1987.
[12] The date of withdrawal is critical. It is on this date that the identity of those liable for withdrawal liability is determined. 29 U.S.C. ง 1391. As earlier indicated, only an "employer" is liable for withdrawal liability.
[13] Nestor Peles specified that the net operating loss incurred by Pelbro during its fiscal year ending 7/31/81 of $90,792.75 (Plaintiff's Exhibit 29) was largely attributable to the loss of coal production during the two and one-half month strike (N.T. 1172-1173), and a total absence of any source of revenues during this period.
[14] See Solomon v. Klein, 770 F.2d 352 (3rd Cir.1985), was a delinquent "contributions" case. An even stronger argument is here presented with respect to withdrawal liability.
[15] Count III of Plaintiffs' original and amended complaints does present the "alter ego" theory of piercing the corporate veil. The Third Circuit In Solomon v. Klein, supra, discussed the standards for review by a district court in an alter ego case, and opined that in proper circumstances the principals of a corporation could be liable for contributions/withdrawal liability of a corporation. This is the sole remaining factual issue before this Court.
[16] During trial, plaintiffs advanced additional theories, never pleaded, that defendants might also be liable under additional state law claims, founded upon "fraudulent conveyances" and "defacto liquidation" theories. Plaintiffs were precluded from raising these claims because of having failed to plead the claims, and under principles of preemption.
[17] It appears that there are only two (2) other bases upon which personal liability of corporate principals may be imposed for the withdrawal liability of a corporation under ERISA. ERISA authorizes a claim upon the statutory theory of "Avoidance", 29 U.S.C. ง 1392(c). A second instance may be found in a claim of personal liability of corporate principals as members of a "controlled group" of businesses, 29 U.S.C. ง 1301(b)(1). Neither of these claims have been pleaded by plaintiffs, neither of the claims were presented at trial and neither are before this Court for review.
[18] The plaintiffs seem to agree. During trial, plaintiffs advised the Court that Robert Westrick formerly a shareholder of Pelbro, was not joined as a defendant in this case, because he was not a shareholder at the "time of withdrawal" (N.T. 863). Plaintiffs were mistaken, however, Westrick was a shareholder of Pelbro on the date of withdrawal, March 27, 1981.
[19] Pelbro had extracted all of the minable coal from the Penn Run job by 1976. The Brush Valley job was mined by Pelbro from 1976 through 1984.
[20] As earlier noted, Westrick was not named as a defendant in this lawsuit.
[21] For unexplained reasons, Plaintiffs never pleaded and have elected not to pursue the statutory remedy available under the "controlled group" sections of ERISA. 29 U.S.C. ง 1301(b)(1).
[22] Pelbro and the UMWA executed the National Bituminous Coal Wage Agreement of 1978 on April 19, 1978 (Defendants' Exh. 36).
[23] The date of Pelbro's withdrawal from the Pension Fund was March 27, 1981.
[24] The insolvency of the corporation at the time of trial is without significance. Seymour v. Hull & Moreland Engineering, supra, 605 F.2d at 1113.
[25] As of March 27, 1981, the aggregate of the shareholder loans, including loans of Yellow Creek and PR & W, totalled $255,000. By August 31, 1983, the aggregate of the loans to the corporation had increased to $______ (Plaintiffs' Exh. 21-22). The loans to Pelbro after the date of withdrawal liability represented a good faith effort to enable Pelbro to fulfill its backfilling requirements (N.T. 1188-1199).
[26] On July 20, 1983 and on July 31, 1983, Pelbro issued five Notes (Defendants' Exh. 45) to the shareholders and PR & W documenting certain loans (N.T. 1200-1202).
[27] Pelbro paid insubstantial wages and salaries to its officers and directors.
[28] All of the other equipment "removed" from Pelbro's depreciation schedules, were the result of bona fide sales, a bank repossession or "trade-ins, junked property and similar dispositions.
[29] Defendants have attached as an Exhibit to their Memorandum for purposes of illustration only, a copy of a complaint filed by these same Plaintiffs in a totally unrelated action in the United States District Court for the District of Columbia, in the case of Connors v. Marontha Coal Co., Inc., Civil Action No. 85-3429. The pleading is illustrative to show the distinction between an "alter ego" theory and a claim under the Avoidance sections of ERISA. Count III of the complaint, sets forth the claim under the Avoidance statute, 29 U.S.C. ง 1392(c), while Count IV sets forth an "alter ego" claim of "piercing the corporate veil". In its review of the complaint, the district court noted that the "Avoidance claim ... can properly only seek recovery of assets actually transferred ... with the intent to evade or avoid withdrawal liability". Connors v. Marontha Coal Co., Inc., 670 F.Supp. 45, 47 (D.D.C.1987).
[30] The total "withdrawal liability" claim of $477,469.23, reflects an obligation of $353,765 to the 1950 Pension Trust and $123,704.23 to the 1974 Pension Trust (Paragraph 17 of the Amended Complaint).